GREGORY P. PLUNKETT & another[1] *vs.* FIRST FEDERAL SAVINGS
AND LOAN ASSOCIATION OF BOSTON & another.[2]

Suffolk.    March 13, 1984. — June 25, 1984.

Present: ARMSTRONG, CUTTER, & PERRETTA, JJ.

*Trust,* Real estate trust. *Mortgage,* Real estate. *Real Property,* Mortgage.
*Estoppel. Notice. Laches. Partnership,* Limited partnership, Dissolu-
tion.

An agreement, concluded in connection with the settlement of a suit in equity
   between the general partner and the limited partners of a partnership,
   which declared an intention to terminate the partnership and provided
   for the limited partners to divest themselves of their partnership interests
   was, in the circumstances, not wholly self-executing and, although inart-
   fully drawn, contemplated some further action by the limited partners
   in order to accomplish an assignment of their interests. [301-302]
Efforts by limited partners to enforce an agreement between themselves and
   their general partner, all of which took place after the granting of a
   mortgage on certain real property of the partnership, could not have
   induced the mortgagee to accept the mortgage in the belief that the
   limited partners regarded the agreement as divesting them of their partner-
   ship interests, and thus did not estop the limited partners from attempting
   to set aside the mortgage. [302-303]
The limited partners under a partnership agreement were not precluded, by
   any of their conduct, from maintaining a proceeding to set aside a
   mortgage of certain real property which had been executed by the pur-
   ported trustee of a "nominee trust" of which the partnership was the
   beneficiary, where the mortgagee had constructive notice from the trust
   instrument, as recorded in the appropriate registry of deeds, that the
   trustee's appointment did not conform to the trust provisions, and where
   the mortgagee could also be regarded as having notice that the partnership
   agreement, as on file with the State Secretary, had expired and that
   consequently the mortgage, except as a step in the liquidation of the
   partnership, was of dubious validity. [304-306]

---

[1] Linda J. Plunkett, wife of Gregory P. Plunkett. Both plaintiffs are
sometimes referred to in this opinion as "Plunkett," despite the transfer
mentioned in note 6, *infra.*

[2] Adam M. Foti.

BILL IN EQUITY filed in the Superior Court on August 25, 1970.

The suit was heard by *McCann*, J., a District Court judge sitting under statutory authority.

*Raymond J. Brassard* (*Martin R. Healy* with him) for the plaintiffs.

*Stuart Todd Rossman* (*George M. Dallas & Daniel B. Bickford* with him) for the defendants.

CUTTER, J. Adam M. Foti and Gregory P. Plunkett on October 30, 1968, joined in a limited partnership, Copley Associates (the partnership), of which Foti was the only general partner. Foti was charged with managing the partnership affairs. Plunkett was the only limited partner. Plunkett and Foti, initially at least, each had an equal half beneficial interest in the partnership assets. The partnership by its terms was to expire on December 31, 1971.[3] The original contribution of each partner was a half beneficial interest in property at 573-575 Boylston Street (the locus) in Boston, until then wholly owned by Foti. On October 30, 1968, Plunkett paid Foti (for the one-half share in the locus to be contributed by Plunkett to the partnership) $15,000 in cash and Plunkett's note for $35,000. On that day also, Foti conveyed the locus to Mr. Robert A. Trevisani as trustee of a so-called "nominee" trust, the Copley Realty Trust (the trust), under a declaration of trust. See Birnbaum and Monahan, The Nominee Trust in Massachusetts Real Estate Practice, 60 Mass.L.Q. 364, 368 et seq. (1976). This deed and the declaration of trust were recorded in the registry of deeds. The declaration of trust did not disclose the names of the beneficiaries but recited that the property was held in trust for the benefit of persons who had filed with the trustee a schedule (never recorded) of beneficiaries in the proportions therein stated. The trust declaration expressly permitted transfer of the beneficial interests in the trust assets to a limited

---

[3] The trial judge found that the tone of the settlement agreement between Foti and the Plunketts, dated May 8, 1972, indicated that the partners then were treating the partnership agreement as still in existence.

partnership[4] (also not identified in the trust declaration). Relevant provisions of the trust are set out in Appendix 1 to this opinion.

The partnership agreement contained broad powers and purposes, but apparently was formed primarily to deal with the locus. A certificate of the formation of the limited partnership was filed in the office of the Secretary of the Commonwealth on November 20, 1968, but was not recorded in the registry of deeds. On October 3, 1969, a certificate of an amendment to the partnership agreement was filed in the office of the Secretary of the Commonwealth,[5] but was not recorded in the registry of deeds.

The foregoing background facts and the subsequent events are stated as set forth in the careful and complete findings of the trial judge who heard on the merits the litigation later mentioned. The evidence is largely documentary, and it does not appear to be contended that the trial judge's findings (as opposed to his interpretations of documents and his legal conclusions) are in dispute.

A. On August 25, 1970, Plunkett, because concerned about the partnership's affairs, sought in the Superior Court an accounting and winding up of the partnership. On September 8, 1970, Mr. Trevisani resigned as trustee of the trust and his resignation was recorded in the registry of deeds. From Mr.

---

[4] By an instrument, signed and acknowledged on October 30, 1968, Plunkett and Foti, as beneficiaries of the trust, agreed that they had instructed Mr. Trevisani, as trustee of the trust, to recognize the transfer of their entire beneficial interest in the trust to the partnership and that he as trustee was thereafter to recognize the partnership as sole beneficiary of the trust. By an instrument of the same date Mr. Trevisani as trustee agreed so to recognize the partnership. Neither instrument was recorded in the registry of deeds.

[5] The certificate of amendment recited that paragraph VII of the partnership agreement had been amended and that a new art. IX had been added. Concerning this addition, the new certificate recited, "XIV. The Partnership Agreement provides that each Limited Partner . . . has irrevocably appointed . . . the General Partner as his attorney-in-fact to execute all instruments and file all documents requisite to carrying out the intention and purpose of the Partnership Agreement, including, without limitation, the filing of . . . certificates . . . and amendments from time to time at the office of the Secretary of State . . . of Massachusetts."

Trevisani's resignation until August, 1972, apparently no designation of a new trustee was attempted.

B. On May 8, 1972, the Plunketts and Foti signed a settlement agreement which was annexed to and "made a part of" a final decree of the same date, dismissing the equity proceedings "with the consent of all parties." The agreement recited that it was the intention of the parties to terminate the partnership agreement and for the Plunketts[6] to "divest themselves . . . of any interest of any . . . nature in" the partnership, the trust, or the locus "except as specifically stated" in the agreement. Article 9 of the agreement provided that the Plunketts *"shall assign . . .* [to Foti] all of their interest, fully and completely in" the partnership, the trust, and the locus, *"upon the execution of this [a]greement* and shall resign in writing whatever positions they . . . have in the same" (emphasis supplied). Other pertinent provisions of the agreement are mentioned in Appendix 2 to this opinion.

C. Plunkett and his then attorney met with Foti on May 26, 1972, for a "closing." Plunkett, in accordance with the agreement, delivered certain partnership records and property to Foti. Foti delivered a check for $5,000 payable to Mrs. Plunkett, and Plunketts' earlier $35,000 note (held by Foti), presumably for cancellation. The Plunketts were then prepared to deliver to Foti instruments conveying their interests in the partnership, the trust, and the locus (apparently as required by art. 11 of the agreement, see Appendix 2). Foti, however, on May 26, 1972, did not deliver to the Plunketts (as required by the agreement) other promissory notes and a mortgage of the locus to secure Foti's obligation under the final decree and the agreement to pay a note, held by New England Merchants National Bank, which had been guaranteed by Mrs. Plunkett and a mortgage (apparently of the locus) to secure this undertaking.

---

[6] Mrs. Linda Plunkett had acquired ten percent of Plunkett's interest in the partnership from him in 1969, but no amendment of the partnership certificate to reflect this transfer was filed.

D.  Foti had applied, some weeks earlier, to First Federal Savings and Loan Association of Boston (First Federal) for a loan (see par. E, *infra*) to the trust to be secured by a mortgage of the locus. First Federal on April 28, 1972, agreed to make such a loan. The facts of Foti's mortgage application and of First Federal's action upon it were not known to the Plunketts until March, 1975.

E.  On August 1, 1972, Foti filed a certificate in the registry of deeds declaring that the partnership was the sole beneficiary of the trust, that he was the general partner, and that Dennis C. Stackhouse was appointed by him as trustee of the trust (in succession to Mr. Trevisani, who had resigned in 1970). On August 1, 1972, Stackhouse, purporting to act as trustee of the trust, gave a mortgage of the locus to First Federal to secure a note for $1,300,000 signed by Stackhouse in behalf of the trust and also by Foti. This mortgage was recorded.

F.  In the latter part of 1972, Plunkett got in touch with his own attorney, with Foti's attorney, and with Foti in an unsuccessful effort to obtain performance by Foti of his unperformed obligations under the decree and agreement of May 8, 1972. A petition to have Foti adjudicated in contempt was filed by Plunkett on February 1, 1973. On March 5, 1973, Foti was adjudged in contempt and, after proceedings which need not be stated in detail, Foti was determined on January 27, 1978, to be indebted to the Plunketts in the sum of $145,346.36. The order of that date directed Foti to transfer to the Plunketts certain assets in reduction of Foti's liability. The order expressly then made "no determination . . . regarding [the Plunketts' previous] allegations . . . that the mortgages held by First [Federal] . . . should be set aside but" reserved those issues for later determination.

G.  No action ever was taken in behalf of the Plunketts to file a lis pendens in the registry of deeds until October 20, 1975. Then such a lis pendens was recorded, after the Plunketts first had become aware of the 1972 mortgage to First Federal. Shortly after that discovery, Plunkett notified First Federal that

he questioned the validity of the 1972 appointment[7] of Stackhouse as trustee of the trust and also the validity of the 1972 mortgage to First Federal executed by Stackhouse as trustee.[8]

H.   On March 12, 1976, Plunkett obtained leave of court to amend his contempt complaint to join Stackhouse and First Federal as parties defendant in order to attempt to pursue the trust assets into the hands of First Federal. In September, 1980, the contempt proceeding again came before the Superior Court. By agreement of counsel, arrangements were made for the Plunketts to proceed on the merits on the Plunketts' substitute amended complaint (and various responsive pleadings) as if those documents had been filed in an independent proceeding against Foti and First Federal. The case was then heard jury-waived by a District Court judge sitting by designation in the Superior Court.

## The Trial Judge's Conclusions.

On the basis of his findings the judge reached the conclusions of law summarized below.

(1) The Plunketts, so the judge ruled, have no present legal or equitable interest in the locus, but may seek specific performance of Foti's obligations under the settlement agreement and

---

[7] On March 21, 1975, Stackhouse filed a petition in the Probate Court for appointment as trustee to fill the vacancy caused by Mr. Trevisani's resignation. The petition was prepared by the attorney who had represented First Federal in connection with the 1972 mortgage and recited (a) that the partnership was the sole beneficiary of the trust, (b) that Foti was the general partner, (c) that the partnership was the only person interested in the petition to which Foti assented and acquiesced in the appointment of Stackhouse. Stackhouse was appointed trustee on March 24, 1975, and the appointment was recorded in the registry of deeds on October 30, 1975. The Plunketts were not given any notice of the probate proceedings or of the appointment. The Probate Court decree did not purport to ratify any actions theretofore taken by Stackhouse as trustee. As these proceedings took place long after the mortgage to First Federal, they seem irrelevant to whether Stackhouse in 1972 had authority to give the mortgage.

[8] On January 13, 1976, First Federal was authorized (under the Soldiers' and Sailors' Civil Relief Act of 1940) by the Land Court to foreclose its mortgage on the locus and on May 20, 1976, took title itself under a foreclosure deed.

final decree. The judge seems to have regarded the agreement and the decree essentially as self-executing, and as ending the Plunketts' "involvement in the partnership . . . in return for a[n] . . . adjudication of . . . [their] claims against Foti," although the agreement remained subject to the continuing jurisdiction of the Superior Court to compel specific performance.[9]

(2) Foti's liability to the Plunketts is set forth in the agreement and decree of May 8, 1972, as further adjudicated by the order of January 27, 1978.

(3) Plunkett could not challenge (a) an alienation of Foti's interest in the locus, except as a transfer in fraud of creditors, or (b) the validity of the mortgage to First Federal of the locus in August, 1972.

(4) First Federal (so the judge concluded) received a good security title under the mortgage of August, 1972.[10]

(5) The Plunketts had accepted satisfaction from Foti of some part of his obligations under the 1972 agreement, and then had consistently sought until 1978 to compel specific performance of the agreement, without filing any lis pendens until 1975. This

---

[9] The judge had found that, after the incomplete "closing" on May 26, 1972, Plunkett assumed (a) "that he still held his one-half beneficial interest in the . . . [locus] and . . . would continue to hold it until he signed it over to Foti" under the 1972 agreement and decree, (b) that he "was no longer interested in the" locus, and (c) "wanted compliance by Foti . . . with the decree." The judge found that after 1972 Plunkett did not report in his tax return income, loss, or depreciation with respect to the locus.

[10] The judge stated as among bases for this conclusion: (a) that First Federal accepted the mortgage for "valid consideration, in good faith and without actual or *constructive* knowledge" (emphasis supplied) of any claim by the Plunketts of an interest in the locus, and that First Federal "correctly concluded from the 1972 . . . [a]greement and [d]ecree that [the] Plunkett[s] had no further interest" in the partnership's property, the trust, or the locus; (b) that First Federal was entitled to rely upon Foti's certificate of August 1, 1972 (see par. E, *supra*) despite "uncertain language" of the trust instrument as to the appointment of a successor trustee; and (c) that First Federal was entitled to conclude that the 1972 agreement had been fully performed to Plunkett's satisfaction, since the 1972 decree "provided for a prompt assignment [to Plunkett] by Foti of his interest in" the locus in the event of Foti's default, and that three months from the entry of a decree had passed without the recording of any such assignment by Foti or the filing of any lis pendens.

led the trial judge to conclude that the Plunketts were estopped to assert in March, 1976, any equitable interest in the locus.

(6) The Plunketts, so the judge concluded, are barred (a) by laches (1972 to 1976) from asserting any equitable interest in the locus, and (b) by the doctrine of "clean hands"[11] from seeking to invalidate the 1972 mortgage to First Federal. The trial judge then concluded that, as between Plunkett (whose conduct, in many respects, exposed his interest to possible abuse by Foti) and First Federal "which at all times acted in good faith, the equities on the side of" First Federal have the greater weight. Accordingly he ordered judgment for First Federal on the Plunketts' action against it. Judgment entered accordingly. The Plunketts have appealed.

1. The Plunketts first contend that the agreement and decree of May, 1972, did not divest them of their indirect ownership interest in the locus. They argue that the agreement was executory and that they were to transfer their indirect equity interest in the locus to Foti in return for his actual payments and for certain indemnification of the Plunketts by Foti against possible liabilities. Although the final paragraph of the preamble of the agreement states the intention that the Plunketts' interest in the partnership, the trust, and the locus shall be divested, the time of such divesting is not stated. The obligations of par. 1 of the agreement speak of payments to be made by Foti in the future and refer to a "closing" to take place on a date certain after the entry of the decree. It is not made clear, however (see Appendix 2), whether the "closing" mentioned relates only to Foti's obligations under art. 1. Article 9, already quoted (see summary of the trial judge's findings, par. B, *supra*), and

---

[11] Circumstances mentioned by the trial judge included: (a) that Plunkett had permitted his interest to be held under "a nominee trust with his interest in the . . . [locus] not a matter of [r]egistry record," (b) that he had entrusted his beneficial interest to a limited partnership "with broad powers of management . . . in the general partner," and (c) that Plunkett had "acquiesced in . . . a trust instrument wherein the provisions for the appointment of a successor trustee were inartfully drawn" and "under which a self-serving certificate of a general partner of the beneficiary partnership" could "conceivably be interpreted as adequate to support the appointment of a successor trustee" of the trust.

art. 11 (see Appendix 2) both suggest that the Plunketts' acts there specified were to take place in the future, presumably at some closing. Consequently, despite the words of arts. 9 and 11 of the agreement that the Plunketts were to "effectuate full and complete ownership" in Foti of their interests in the partnership, the trust, and the locus "upon" or "at the execution of this agreement," we do not accept the trial judge's conclusion that the agreement and decree of May, 1972, in effect were wholly self-executing. The strongest indication to that effect, of course, is the phrase "at the execution of this agreement."[12] We, of course, recognize that the 1972 agreement and decree contained serious ambiguities.[13]

The interpretation of the agreement and decree of May 8, 1972, in some degree may be affected by the later conduct of the parties. See *Martino* v. *First Natl. Bank of Boston,* 361 Mass. 325, 332 (1972). The fact (see note 9, *supra*) that the Plunketts, after 1972, did not use in tax returns the income and possible tax deductions related to the locus may be some indication that the Plunketts regarded the agreement as releasing all their interest in the locus. This indication has been considered in our different interpretation of the 1972 agreement.

The Plunketts, of course, never had title to the locus, so no deed from them would have been required. Nevertheless, appropriate assignments of their partnership and trust interests (against Foti's performance) would have been usual and seem called for by arts. 9 and 11 of the 1972 agreement.

There is no question that the Plunketts at first pressed for performance by Foti of the agreement through their and Foti's

---

[12] As the Plunketts point out in their brief, if this meant that the 1972 agreement was self-executing, this would have called for the delivery on May 8, 1972, of the mortgage required by art. 13 of the agreement "upon the execution of this agreement or within such time as the parties do agree in writing" from Foti to secure an indemnification agreement (see last sentence of Appendix 2). No such mortgage was then delivered, which suggests that as to this the parties also contemplated a closing.

[13] The inherent ambiguities in the agreement lead us to treat as distinguishable cases like *Tuttle* v. *Metz Co.,* 229 Mass. 272, 275 (1918), where "[t]he contract itself, and not its performance" was accepted "in extinction" of an earlier claim, and like *Adams* v. *Herbert,* 345 Mass. 588, 590-591 (1963).

counsel and took no action to set aside the 1972 agreement and decree, which at least had been partly performed by Foti at the closing on May 26, 1972. The contempt petition in March, 1973, and the Plunketts' efforts to obtain adjudication of the amount due to them, culminating in the Superior Court order of January 27, 1978, are acts to enforce the 1972 agreement and decree rather than to set them aside. All of these efforts, however, took place after the mortgage of the locus on August 1, 1972, had been given by Stackhouse to First Federal. Thus the Plunketts' efforts could not have misled First Federal into any belief that the Plunketts were treating the agreement of May 8, 1972, as transferring in and of itself to Foti their interest in the locus.[14] We perceive no change of position by Foti resulting from the Plunketts' efforts to enforce the 1972 agreement which should estop them in 1976 to attempt to set aside the 1972 mortgage as an alternative remedy by way of substitution for or amendment of their earlier contempt complaint.

2. The Plunketts contend that the limited partnership was dissolved as matter of law on December 31, 1971, by virtue of the statement to that effect reflected in the certificate filed in 1968 with the Secretary of the Commonwealth (see note 5, *supra,* and the related text of this opinion). See G. L. c. 109, § 2(1)(a)(V), as it read prior to the amendment by St. 1982,

---

[14] The Plunketts are not barred from seeking to enforce, by an attempt to reach the locus, their claim against Foti by any principle that they have elected to follow an inconsistent remedy without a clear attempt to rescind or set aside the 1972 agreement. See Restatement (Second) of Contracts § 378 (1981); 5A Corbin, Contracts §§ 1214, 1218-1220, 1223 (1964 & Supp. 1984); 1 Palmer, Restitution §§ 4.6, 4.13 (1978 & Supp. 1982). See also Restatement (Second) of Contracts §§ 380-384 (1981); Restatement (Second) of Restitution §§ 9-13 (Tent. draft No. 1, 1983). These authorities suggest that principles concerning election of remedies have been much modified in recent years. Because the judge who entered the order of January 27, 1978, with respect to the extent of Foti's liability expressly reserved "for future determination" issues concerning the Plunketts' attempts to set aside the mortgage to First Federal, that remedy is not barred to the Plunketts by any prior judgment. See Restatement (Second) of Judgments §§ 24, 25, comments k and m (1982). See also *Raimondo* v. *Burlington,* 366 Mass. 450, 451-452 (1974); Mass.R.Civ.P. 18(a), 365 Mass. 764 (1974).

c. 202, § 1; but see now the Revised Uniform Limited Partnership Act, G. L. c. 109, § 8(a)(11). The trial judge found (as has been stated in note 3, *supra*), that the tone of the agreement of May, 1972, suggested that the partnership was treated by Foti and Plunkett as still then in existence.[15]

3. The trust (see Appendix 1, to this opinion) provides (art. 4) only one method of appointing a new trustee to fill a vacancy, viz., "upon request of the [b]eneficiaries by instruments in writing signed by the *remaining [t]rustee . . .* then acting" (emphasis supplied). On August 1, 1972, when Foti filed in the registry of deeds (see par. E, summary of findings, *supra*) his certificate (as to the beneficial interests in the trust) and purported to appoint Stackhouse as trustee, there was no remaining trustee of record. There thus was no compliance with the trust instrument which seems to us explicit on the point, even if it (see note 11, *supra*) could have been less "inartfully drawn." The validity of the purported appointment of Stackhouse (without prior resort to the procedure under G. L. c. 203, § 5) was placed at the least seriously in doubt. See Restatement (Second) of Trusts § 108 (1959); 2 Scott, Trusts §§ 108.2-108.4 (3d ed. 1967 & Supp. 1983). See also Park, Real Estate Law § 163 (1981); Davis, Massachusetts Conveyancers' Handbook § 5 (2d ed. 1967 & Supp. 1983).[16] The Plunketts contend that First Federal, from the recorded trust, had notice of the trust's provisions and should have known that a mortgage from Stackhouse to it could convey no security title. See G. L. c. 203,

---

[15] Under the former c. 109, § 2(1)(a)V, persons dealing with the partnership after December 31, 1971, at least were placed on inquiry, by the certificate (not amended as to the date of termination) on file with the Secretary of the Commonwealth (a) whether the partnership had been dissolved and (b) what was the continuing authority of the general partner, except perhaps with respect to acts involved in liquidating the partnership affairs. See *Locke* v. *Fahey,* 288 Mass. 341, 344-345 (1934). See also *Adelman* v. *United States,* 304 F. Supp. 599, 602 (C.D. Calif. 1969); Rowley, Partnerships § 53.24 (1960). Compare *Leventhal* v. *Atlantic-Rainbow Painting Co.,* 68 N.J. Super. 406, 410-412 (1961), under a somewhat more explicit statute.

[16] The situation is not affected by G. L. c. 184, § 34, because the mortgage to First Federal signed by Stackhouse set out the record reference to the trust.

§ 2.[17]  See also *Baker* v. *James,* 280 Mass. 43, 46-47 (1932); *Swartz* v. *Sher,* 344 Mass. 636, 642 (1962). The Plunketts or their counsel reasonably could have believed in 1970 and thereafter that no transfer of the locus by the trust could be undertaken without a court appointment of a new trustee involving notice to them. See *Dexter* v. *Cotting,* 149 Mass. 92, 95-96 (1889); *Waitt* v. *Harvey,* 312 Mass. 384, 391 (1942). See also the last sentence of note 17.

4.  The situation presented is one where First Federal has taken and foreclosed a mortgage signed by Stackhouse purporting to act as trustee. First Federal had constructive notice from the registry record that Stackhouse's appointment did not conform to the method designated in the trust. First Federal also probably should be regarded as having constructive notice that the term of the partnership had expired and that a mortgage, except as a step in liquidation of the partnership, in any event was of doubtful propriety.

The Plunketts made no representations to First Federal, for they were not informed of the proposed mortgage and did not know of it until 1975. Prior to 1970 Plunkett had placed in Foti (see notes 4, 5, 10, and 11, *supra*) strong indicia of authority to act for the partnership, at least while it was conducting the partnership enterprise. He had permitted legal title to the partnership's principal asset to be in a nominee trust without any disclosure on the registry record of the beneficial ownership. The Plunketts had been parties to the 1972 agreement with Foti which was in various respects ambiguous. They had not been diligent in pursuing Foti or in protecting their interests, but we perceive no respect in which they had been guilty of laches in any manner affecting First Federal or of un-

---

[17] Because Foti's certificate of August 1, 1972, was filed by one not then a trustee of the trust, the certificate is not entitled to the conclusive effect to be given to certificates of a trustee by art. 3 of the trust agreement. See Appendix 1 attached. Also Foti's certificate put First Federal on notice that the beneficiary of the trust was the partnership, a limited partnership. Consultation of the records of the partnership in the office of the Secretary of the Commonwealth (see note 15, *supra*) would have revealed the date fixed for termination of the partnership.

conscionable conduct which should bar them from relief because of the "clean hands" principle. 2 Pomeroy, Equity Jurisprudence §§ 397-404 (5th ed. 1941). Their failure to file in the registry of deeds, prior to 1975, any lis pendens had no tendency to mislead First Federal into taking a mortgage in August, 1972, from one who was not a validly appointed trustee after the term of the partnership had expired in accordance with its certificate on file with the Secretary of the Commonwealth.

As between two parties, First Federal and the Plunketts, each acting in good faith, we perceive no reason for barring the Plunketts from relief on any of the grounds relied on by the trial judge (see note 11 and related text, *supra*). We hold that the Plunketts may move to set aside the mortgage and to reach the locus or its proceeds in efforts to obtain satisfaction of their claims.

The judgment is reversed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX 1.

*Pertinent Provisions of the Copley Trust.*

Such provisions include the following:

"2. The Trustee shall have full . . . authority to take . . . all and only such lawful and proper action with respect to the Trust Estate (including . . . deeds, *mortgages*, . . . *which may* . . . *extend beyond* the termination of this Trust) as may be *directed in writing by all of the Beneficiaries* . . . . 3. All persons dealing with or claiming under any action taken by the Trustee may rely conclusively upon a certificate signed by *any Trustee* as to *any fact or facts* concerning . . . *this Trust,* including without limitation, directions or notices given or other actions taken by the Trustee or the Beneficiaries pursuant hereto; and every instrument executed and delivered by the Trustee shall *of itself* be conclusive evidence that the Trustee was directed by all of the Beneficiaries to execute and deliver the same and that this Trust was then in full force and effect . . . . 4. Any Trustee may . . . resign by an instrument in writing, mailed . . . to the Beneficiaries . . . and

successor or additional Trustees shall be appointed . . . *upon request by the Beneficiaries* by instruments in writing signed *by the remaining Trustee or Trustees then acting hereunder.* Upon every appointment of a new or additional Trustee, the title to the Trust Estate shall, without more, vest in such Trustee jointly with the remaining Trustee or Trustees. [Paragraph 5 omitted.] 6. This Trust Agreement shall be recorded with the Suffolk Registry of Deeds and the Trustee *shall from time to time record* with said Registry *certificates signed by him as to any resignation,* removal *or appointment of Trustee,* and upon termination, the Trustee shall likewise file or record a certificate thereof. *Any person dealing with the Trust Estate may rely conclusively upon any certificate by the Trustee of* the kind described above, *which is signed by a person who, according to the records of such Registry, appears to be a Trustee hereunder.* In addition, any person dealing with the Trust Estate may rely conclusively upon a certificate signed by persons, who, *according to the records of such Registry, appear to be the Beneficiaries hereof,* to the effect *that any successor Trustee hereunder has been validly appointed* and is authorized to act with respect to the Trust Estate and possesses full powers and authority granted to the Trustee hereunder. [Paragraph 7 omitted.] 8. . . . . . The word "Trustee" as used in this Declaration of Trust shall refer to the Trustee or Trustees from time to time acting hereunder . . . ." (Emphasis supplied.)

## Appendix 2.

*Certain Provisions of the Settlement Agreement of May 8, 1972.*

Articles (in addition to those mentioned in the body of this opinion) of the agreement of May 8, 1972, provided for certain payments to be made by Foti to the Plunketts or to creditors of the partnership, and for indemnification of the Plunketts by Foti against various claims. Article 1 expressly provided that "[t]he closing shall be held no later than by the close of that business day which occurs on the 10th calendar day after the date of entry of" a decree, in the case then being settled. It is not clear, however, whether the term "[t]he closing" referred only (a) to obligations of Foti under art. 1 of the agreement or (b) to all obligations of Foti and the Plunketts under other provisions of the agreement, including art. 11, requiring the Plunketts to "execute and deliver [to Foti] all documents necessary . . . to effectuate . . . complete ownership in" the partnership, the trust, and the locus "at the execution of this Agreement, and thereby any and all claims by the parties to each other relating to . . . [the trust, the partnership, and the locus] whatever, directly or indirectly shall terminate." Article 13 of the agreement referred to a note of Foti and one or the other of the Plunketts to New England Merchants National Bank against liability on which Foti was to indemnify the Plunketts, and to secure this indemnification Foti agreed to give a suitable mortgage and note "upon the execution of this Agreement or within such time as the parties do agree in writing."