GEORGE M. TULL vs. MISTER DONUT DEVELOPMENT
CORPORATION & another.[1]

Norfolk.    April 11, 1979. — May 22, 1979.

Present: GRANT, PERRETTA, & KASS, JJ.

*Frauds, Statute of. Contract,* What constitutes.

A letter containing a summary of a proposed lease agreement, which
   indicated that details of the transaction were yet to be resolved and
   would be incorporated in documents yet to be drawn, did not consti-
   tute an enforceable memorandum of a contract. [629-630]
Although the draft of a lease and ancillary documents sent by a pro-
   posed lessee to the lessor constituted an offer, there was no accept-
   ance and thus no contract by which the lessee could be bound where
   the lessor returned the documents, revised in material respects, to
   the lessee with an additional request that the lessee's parent corpo-
   ration guarantee the lease. [630-631]
A landowner was not entitled to rest contractual rights on his own
   reliance on promises made by a prospective lessee in order to recov-
   er damages for rental income lost through the landowner's termi-
   nation of existing tenancies in his building, at a time when complex
   lease terms were still under negotiation between him and the pro-
   spective lessee. [631-632]

BILL IN EQUITY filed in the Superior Court on August 18,
1970.

The suit was heard by *Lynch,* J., on a master's report.

*Richard J. Levin* for Mister Donut Development Corpo-
ration.

*George H. Howard* for the plaintiff.

KASS, J. In this case the plaintiff Tull's right to recover
depends on whether, when the defendant Mister Donut
Development Corporation (Mister Donut) decided not to
lease Tull's real estate, the parties were in a state of

[1] Mister Donut of America, Inc.

"imperfect negotiation" or whether their dealings had by that time added up to an offer and acceptance or course of conduct sufficient to bind Mister Donut. We conclude that the negotiations were inchoate and that Mister Donut is entitled to prevail.

We derive the facts of the case from a master's subsidiary findings in a report which the judge adopted and on the basis of which he entered judgment for the plaintiff against Mister Donut and judgment for Mister Donut's parent corporation, Mister Donut of America, Inc. These subsidiary findings are binding upon us unless they are clearly erroneous, mutually inconsistent, contradictory or vitiated in view of the controlling law. *Selectmen of Hatfield* v. *Garvey*, 362 Mass. 821, 825 (1973). *Michelson* v. *Aronson*, 4 Mass. App. Ct. 182, 190 (1976). Mass.R.Civ. P. 53 (e) (2), 365 Mass. 820 (1974). We must then take these findings, together with the inferences that ought to be drawn from them, and reach our own ultimate conclusions. *Ryan* v. *Stavros*, 348 Mass. 251, 253 (1964). *Bridge Enterprises, Inc.* v. *Futurity Thread Co.*, 2 Mass. App. Ct. 243, 246 (1974). *Bills* v. *Nunno*, 4 Mass. App. Ct. 279, 283 (1976). To assist us in this regard we have had the benefit of certain exhibits which were incorporated in, and appear to have been appended to, the master's report. Contrast *Jones* v. *Gingras*, 3 Mass. App. Ct. 393, 395 (1975); *Harbor Schs., Inc.* v. *Board of Appeals of Haverhill*, 5 Mass. App. Ct. 600, 602 n.4 (1977).

In June, 1968, Robert T. Piccarelli, identifying himself as a representative of Mister Donut, expressed interest in real estate at 555-563 Washington Street in Quincy, which Tull owned, as the location for a Homer's take out chicken store.[2] As Piccarelli outlined the proposed transaction, Tull was to demolish a small structure devoted to retail and residential use, which stood on a portion of the locus, so as to achieve a sufficiently commodious site. On

---

[2] This operation had apparently hatched as a division under the wing of the Mister Donut chain.

the cleared site, Tull was to erect, to Mister Donut's specifications, a building which he would lease to it. Piccarelli said he would assist Tull in securing mortgage financing for the new building. Further discussions ensued with Mister Donut's development manager and on August 13, 1968, Piccarelli wrote to Tull a letter, the full text of which appears in the margin.[3] Two weeks later, on August 27, 1968, Piccarelli sent to Tull for his approval a form of lease and ancillary documents.

---

[3] Homer's
  Westwood, Massachusetts
  August 13, 1968

  Mr. George M. Tull
  Attorney and Counselor at Law
  1354 Hancock Street
  Adams Building – Suite 315
  Quincy, Massachusetts 02169

  Dear Mr. Tull:

    Just so we have the rudiments of our deal on record, I would like to delineate what we have discussed and, I believe agreed upon.

    Mister Donut will lease from you, for 20 years, plus two ten year options, the following location, with building and improvements to be erected thereon, 555, 557, 561 and 563 Washington Street, Quincy, Massachusetts.

    Mister Donut agrees to pay a yearly rental fee of $13,500.

    A cost of construction guarantee will be provided by Mister Donut which guarantees the cost of construction at $65,000.00.

    Mister Donut agrees to pay all Real Estate Taxes and Insurance costs which during the term may be imposed or become due and payable for Leased Premises and improvements.

    I believe that these are the salient features of our agreement as I understand them.

    I hope in the very near future preliminaries will be completed and we will be getting underway.

  Very truly yours,

  Robert T. Piccarelli
  Associate Development Manager

  Enc. Specs and plans, Cost of Construction, Lease of Land with building to be erected.

Thus armed, Tull arranged for a conference concerning a construction and permanent loan from the Wollaston Federal Savings and Loan Association (the bank). On October 7, 1968, the bank issued a loan commitment, and the papers, including the proposed lease, were referred to the bank's lawyer for review.

At about this time Tull took steps to empty of its tenants the building he would have to demolish. Once emptied, the building was vandalized, suffered a fire and had to be torn down. Tull has waived any claim for damage to the property and pursues damages equal to lost net rental income from the lease he expected to make with Mister Donut.

Counsel for the bank reviewed the documents and modified the lease which Mister Donut had submitted in at least two material respects: (1) he deleted a clause which would have allowed the tenant to terminate the lease if it could not obtain certain public approvals; and (2) he altered a clause which would have permitted the tenant to terminate the lease on thirty days' notice (provided that the tenant should reimburse the landlord for the cost of unamortized improvements) so that the tenant could not terminate the lease until the fifth year had expired. The bank's counsel also insisted that Mister Donut's parent, Mister Donut of America, Inc., guarantee the tenant's obligation under the lease. Tull signed the lease as modified and returned it to the bank's counsel, who, in turn, sent the counter draft to Mister Donut for approval and counter signature. Although the record is murky on the point, we infer that the bank's lawyer included with the counter draft a request for the guaranty of the parent corporation. Mister Donut never signed the lease, despite an assurance from its development manager some time in early November that this would be done, and notified Tull a few months later (in January, 1969) that it was no longer interested in the transaction.

Tull fastens on the initial written summary of the proposed transaction which Piccarelli sent to him on August

13 as constituting a memorandum signed by the party to be bound which was sufficiently detailed to support a contract. G. L. c. 259, § 1. *Sands* v. *Arruda,* 359 Mass. 591, 596 (1971). *Bridge Enterprises, Inc.* v. *Futurity Thread Co.,* 2 Mass. App. Ct. at 246-247. Compare *Des Brisay* v. *Foss,* 264 Mass. 102 (1928). Neither the language of the document nor its context lends comfort to the plaintiff's position. Piccarelli's letter begins by saying that he is describing the "rudiments of our deal" and concludes with an expression of hope "that in the very near future preliminaries will be completed," thus signifying that details of the transaction were yet to be resolved and would be incorporated in documents yet to be drawn. Normally the fact that parties contemplate the execution of final written documents justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled. *Rosenfield* v. *United States Trust Co.,* 290 Mass. 210, 216 (1935). *Wasserman* v. *Roach,* 336 Mass. 564, 568 (1958). Taken in context, a reasonably informed participant in a commercial venture would realize that August 13 letter was not adequate to govern the rights and obligations of the parties for a period that might run for forty years. The inclusion with Piccarelli's letter of a printed form of lease, with no blanks filled in, underscores that it was intended by him to serve as an agenda for further discussion. Not the least of the unresolved topics were the financing of the improvements and the timing of construction. With final terms still to be hammered out, the parties could not be bound. *Geo. W. Wilcox, Inc.* v. *Shell E. Petroleum Prod., Inc.,* 283 Mass. 383, 387, 390 (1933). *Rosenfield* v. *United States Trust Co.,* 290 Mass. at 217. *Saxon Theatre Corp.* v. *Sage,* 347 Mass. 662, 666 (1964). *Blair* v. *Cifrino,* 355 Mass. 706, 709-710 (1969).

What Piccarelli sent to Tull two weeks later, the draft of a lease and ancillary documents, could, indeed, be taken as an offer. It was an offer which Tull, however, was not able to accept since it contained provisions which

failed to satisfy the requirements of his bank. As returned to Mister Donut, the documents were revised in more than trifling detail and stood as a counter offer. *Champlin* v. *Jackson,* 317 Mass. 461, 463 (1945). *Peretz* v. *Watson,* 3 Mass. App. Ct. 727, 728 (1975). The insistence upon a guaranty of the lease by the parent, although this request hardly could have surprised Mister Donut, added another significant element of counter offer. On the basis of the documents there was no offer and acceptance, and no contract.

This leaves us to inquire whether Tull may rest contractual rights on reliance by him on promises made by Mister Donut. See *Cellucci* v. *Sun Oil Co.,* 2 Mass. App. Ct. 722, 728 (1974), *S.C.,* 368 Mass. 811 (1975); *Loranger Constr. Corp.* v. *E.F. Hauserman Co.,* 376 Mass. 757, 760-761 (1978). The idea of reliance on a promise presupposes that the person who has relied on a promise has been induced to some action which, but for the promise, he would not have taken. In the *Cellucci* case, for example, the plaintiff had been repeatedly assured by the defendant's representative that a fully negotiated lease would be signed by the defendant as a matter of routine and, as a consequence, forebore to sell his property to another party. When Tull changed position in this case by terminating the tenancies in the building on the locus, the lease documents were still under negotiation. To the extent that Tull might thereafter have relied on the representation of Mister Donut's development manager that the lease would be signed, there is nothing in the record to indicate that he took any action on it.

A commercial transaction of the kind which gave rise to this litigation often has many players — the prospective landlord, the prospective tenant, the financing source of each, licensing authorities, and land use permit granting authorities. The final governing documents are generally complex, reflecting adjustments to the requirements of the various participants. These papers are far from being just another "wheel in the machinery." *Drum-*

*mond* v. *Crane,* 159 Mass. 577, 579 (1893). *Blair* v. *Cifrino,* 355 Mass. at 710. Until the documents are signed and delivered the game is not over. Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements.

In emphasizing the importance of final integrated instruments as a touchstone of the conclusion of a course of negotiations in a complex commercial setting, we do not depart in any way from the principles applicable in those circumstances where it is reasonable for the promisee to have relied and acted upon what a promissor has written, said or done and no further negotiation would be expected. See, e.g., *Duggan* v. *Matthew Cummings Co.,* 277 Mass. 445, 450 (1931); *Cellucci* v. *Sun Oil Co.,* 2 Mass. App. Ct. at 729-732.

The judgment for the plaintiff against Mister Donut Development Corporation is reversed and a new judgment is to be entered dismissing the action.

*So ordered.*