NOVEL IRON WORKS, INC. vs. WEXLER CONSTRUCTION
COMPANY, INC., & others.[1]

No. 87-576.

Middlesex. February 10, 1988. — September 22, 1988.

Present: GRANT, PERRETTA, & FINE, JJ.

*Practice, Civil,* Complaint, Amendment. *Contract,* Building contract, What
constitutes, Performance and breach, Damages. *Frauds, Statute of. Dam-
ages,* Breach of contract, Loss of profits. *Restitution.*

A judge at the trial of a civil action acted within his discretion in allowing,
on the last day of trial, a defendant's motion to amend its cross claim
to conform to the evidence, where the parties objecting to the motion
failed to show that they were prejudiced by its allowance. [406-407]
A finding that parties to a joint venture for the purpose of building con-
dominiums had entered a binding oral contract with the general contractor
chosen for the venture was warranted by the circumstances attending
the negotiation of the contract indicating that the parties had agreed to
all the essential terms of their transaction and thereafter engaged in
activities consistent with their agreement. [407-410]
An oral agreement between the parties to a joint venture for the purpose
of building condominiums and the general contractor chosen for the
venture was not within the Statute of Frauds, G. L. c. 259, § 1, Fifth,
where, although it did not appear that the agreement required the general
contractor to complete the project within a year, neither did it appear
that the parties expressly agreed that the general contractor would not
finish within that period. [410-411]
A building contractor maintaining that it had an oral contract with parties
to a joint venture for a fee in the amount of a percentage of the total
costs of a completed construction project was entitled to the fee it would
have earned had it been permitted to complete its performance under
the contract, where the amount of the fee had been established with a
fair degree of certainty and rested upon a solid foundation in fact. [412-413]

[1] Boston Realty Advisors, Inc., and Home Life Insurance Company. The
trustees of the North End Development Trust, Anthony L. Orlando, Michael
Giglio, and Dennis C. Stackhouse, were also named as defendants, but
there appears to have been no finding or judgment against them.

A building contractor who was entitled under the terms of a written but
unsigned contract to reimbursement of certain specified out-of-pocket
costs incurred in its performance of work in constructing condominiums,
but who was unable to begin performance because construction was
never commenced, through no fault of its own, was entitled to reimburse-
ment for certain expenditures incurred in preparation for its performance
of the work to be done. [413-414]

CIVIL ACTION commenced in the Superior Court Department
on July 8, 1982.

The case was heard by *Jeremiah J. Sullivan,* J., sitting under
statutory authority.

*F. Anthony Mooney ((Linda A. Ouellette* with him) for Home
Life Insurance Company.

*James C. Heigham* for Boston Realty Advisors, Inc.

*Warren G. Miller* for Wexler Construction Company, Inc.

PERRETTA, J. For the purpose of building condominiums on
property owned by the North End Development Trust (Trust),
Boston Realty Advisors, Inc. (Boston), and Home Life Insur-
ance Company (Home) formed a joint venture.[2] Wexler was
to be the general contractor for the project. Novel furnished
structural steel to Wexler pursuant to an oral subcontract. The
enterprise ultimately failed, and actual construction was never
commenced. Novel was not paid for its fabrication and furnish-
ing of the steel, so it brought this action to reach and apply
any monies due Wexler from the other defendants. Wexler
had not been paid for its labor, supplies, and services, and it
filed a cross claim against Boston and Home. The case was
tried without a jury. On the last day of the trial, the judge
allowed Wexler to amend its cross claim to conform to the
evidence. Wexler maintained that it had an oral contract with
Boston and Home for a fee in the amount of a percentage of
the total costs of the completed project. After the close of the
evidence and while the case was under consideration, Novel's

___

[2] The joint venture was known as 350 North Street Associates. In the
context of this opinion, the joint venture is generally referred to as Boston
and Home.

claims were settled and its action dismissed by stipulation of the parties. Thereafter judgment entered against Boston and Home for Wexler in the amount of its labor, materials, and anticipated fee on the project. Boston and Home appeal, claiming error in the judge's allowance of Wexler's motion to amend and in his findings of fact and conclusions of law concerning the existence and enforceability of the oral contract and the sufficiency of Wexler's proof of damages and entitlement thereto. We affirm.

## I. *The Facts.*

We relate the facts as found by the judge. Wexler has been engaged in the construction business since 1947, specializing as a general contractor for commercial buildings. Kenneth Wexler is the president of the company. Dennis C. Stackhouse was the president of Boston, a real estate development company, as well as a trustee of the trust. Home had agreed, at least tentatively, to participate with Boston in the development of a condominium complex at 350 North Street, Boston. That parcel of land was owned by the trust.

Some time in late 1980, or early 1981, Kenneth Wexler and Stackhouse entered into discussions concerning the condominium project. On or about January 30, 1981, Stackhouse wrote to Wexler on behalf of the trust advising Wexler that "[i]t is our intention to award Wexler . . . a contract" for the construction project. The letter further advised that the "basis for the contract will be either a lump sum or upset price with a fee," and that "[t]his commitment" was subject to "our arriving at a mutually agreeable contract, a mutually agreeable contract price and our obtaining construction financing."

Throughout the first eight months of 1981, Stackhouse and Kenneth Wexler met frequently. Wexler had hired a plumbing and heating contractor as well as an electrical contractor to design the mechanical aspects of the building. The trust engaged an architectural firm, Vitols Associates (Vitols), and Vitols retained a structural engineer, David Berg. Berg and members of Vitols attended some of the meetings between

Stackhouse and Wexler. Wexler made numerous suggestions as to various ways cost savings could be achieved. By late August, a formal set of architectural and structural drawings and a detailed book of specifications had been completed.

On September 2, 1981, there was a meeting attended by Kenneth Wexler, Stackhouse, as Boston's authorized agent, and Fred King, an authorized agent of Home. King advised Wexler that Home was a partner with Boston on the project. After discussion among the three concerning prices and various other aspects of the project, Stackhouse and King informed Wexler of the following specifics. Wexler would have the job of building the condominium complex at a price equal to its (Wexler's) costs plus a fee of six percent of those costs. However, the total of the costs and the fee was not to exceed a guaranteed maximum contract price of $4,255,000. Any cost savings were to accrue to the joint venture and to Wexler, seventy and thirty percent respectively. It was also agreed that the project would be a " 'fast-track' job, meaning a job where materials requiring a long time to obtain would be ordered early in order to insure timely delivery." Starting and completion dates were set, and "[a]ll parties shook hands in token of their acceptance of that agreement," which was to be memorialized by a formal contract to be drafted by their attorneys. Thereafter, these terms were set out in two drafts, both dated September 15, 1981. The terms of each were the same and essentially incorporated the terms discussed on September 2, 1981. The only difference between the drafts was that the first named Boston as the owner, whereas the second, which was sent to Wexler by counsel for the joint venture on January 6, 1982, named the joint venture as the owner. Neither draft was ever signed by any of the parties.

The project was kept on a "fast-track." Wexler, based upon the drawings and specifications completed in August, had price quotations from various steel suppliers. On September 24, 1981, Kenneth Wexler, Stackhouse, and King met, and King told Wexler to order the necessary structural steel. That was done on October 9, when Kenneth Wexler met with Novel's principals, Leo Moreau and Ralph Noveletsky. At this meeting

it was orally agreed that Novel would fabricate and supply the steel for $230,000, and that Wexler would pay Novel "only" after it (Wexler) had received payment for the steel from the joint venture.

Acting as the general contractor, Wexler also did the following: arranged for the issuance of a performance and payment bond which was to be executed simultaneously with the general contract, assigned a project manager to the job, obtained building permits,[3] made several oral awards of subcontracts, arranged for placement of a trailer at the job site, performed exploratory site work, and received and transmitted shop drawings from subcontractors, including Novel. Home and Boston executed a formal joint venture agreement on October 23, 1981.

Between October 20, 1981, and January 7, 1982, Novel ordered and received the structural steel at its plant located in Greenland, New Hampshire. By February, Novel had completed its fabrication work on over forty-two of the 234 tons of steel. In the meantime, on December 7, 1981, King wrote to Stackhouse, advising him (perhaps now officially, because in writing) to order the steel which would be paid for by the joint venture. King further wrote that "[a]ctual payment will not be made until the steel has been delivered which will be in the next two to three months, and until we have received the first draw under our construction loan . . . ." The next day, Stackhouse sent a copy of the letter to Wexler with a cover letter stating, in part, that the enclosed letter was "authorization" for Wexler to order the steel for the joint venture. Wexler responded to Boston on December 10, 1981, by letter, a copy of which was also sent to King. The letter reads: "We have ordered the steel as your agent until such time as a contract is entered into between us for the entire project. It is our understanding that you are responsible for the costs of the steel and related expenses such as shop drawings, engineering and freight should a contract not be executed between us."

---

[3] The structural building permit was paid for by Stackhouse, who issued his check to the city of Boston and gave it to Wexler, which delivered it to the city of Boston in November, 1981.

Thereafter, in December and January, Boston and Home obtained a loan commitment from the Provident Institution for Savings (Provident) which was never exercised. Exactly why or when trouble between the joint venturers began is not entirely clear. In any event, on February 9, 1982, Stackhouse informed Wexler that all work on the project was to cease. In turn, Wexler immediately notified Novel that it, too, was to cease work on the steel.

## II. *Wexler's Motion to Amend.*

Boston and Home allege numerous errors in the judge's findings and conclusions pertaining to whether Boston, Home, and Wexler entered into a binding, enforceable oral construction contract on September 2, 1981. Before turning to those claims, we consider the threshold question whether Wexler's motion to amend its cross claim to conform to the evidence, see Mass.R.Civ.P. 15(b), 365 Mass. 761-762 (1974), was properly allowed.

No lengthy discussion is required. By its cross claim as originally presented, Wexler sought to recover its costs and expenses (for labor, materials, and services) incurred on the project "with a view toward the execution of a general contract." During trial, there was testimonial and documentary evidence showing the terms of the contract which was to be executed and which formed the basis, in part, at least, for damages beyond the money due and owing Novel. One of those terms was that Wexler, in addition to its costs, was to receive a fee in the amount of six percent of the costs of construction with a guaranteed maximum contract price of $4,255,000. As amended to conform to the evidence, Wexler's cross claim asserts a right to recover the fee that it would have received had it been allowed to complete the construction project.

As Boston and Home objected to the motion to amend, the question before us is whether they were prejudiced by its allowance. See *Hall* v. *Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84, 88 (1987). See also Smith & Zobel, Rules Prac-

tice § 15.8 (1974 and Supp. 1988). Although Boston and Home claim prejudice, they have shown none.[4] Compare *Parkman Equip. Corp.* v. *S.A.S. Equip. Co.*, 14 Mass. App. Ct. 938, 940-941 (1982); *Hall* v. *Horizon House Microwave, Inc.*, 24 Mass. App. Ct. at 86-88; *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 434-436 (1987). It is not enough to argue that the motion should not have been allowed as it was not brought until after the close of the evidence. Rule 15(b) provides that the motion may be brought "at any time, even after judgment." We see no abuse of discretion in the allowance of the motion.

## III. *The Contract.*

Boston and Home claim that there was no contract binding them to Wexler for the following reasons: (a) the facts found by the judge are insufficient as matter of law to show that they had agreed to all the material terms of their transaction and that any subsequent writing was to be a "mere memorial of the contract," *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935); and (b) any contract had to be in writing to be enforceable as the agreement was not capable of being fully performed within a year of its making. See G. L. c. 259, § 1, Fifth. See also *Richard Tucker Associates, Inc.* v. *Smith*, 395 Mass. 648 (1985).

(a) *Existence of a binding agreement.* The issue here is whether on September 2, 1981, the "parties bound themselves irrevocably to a contract." *Rosenfield* v. *United States Trust Co.*, 290 Mass. at 215. The legal principles which are to be applied in resolving the issue are well established. Where, as here, parties negotiate orally as to the terms of an agreement while intending to execute a written contract, the parties

---

[4] Boston and Home's arguments in respect to the evidence of the amount of the projected costs of construction, and, hence, the amount of Wexler's fee, go to the sufficiency of Wexler's evidence. They make no claim of an inability to meet or to refute Wexler's proof by reason of late notice or surprise. Nor did either make such a claim to the judge in objecting to the motion.

generally are not bound until the contract is signed. If, however, the parties orally agree to the essential terms of the transaction, it may be inferred that they intended to bind themselves at that time and that the "writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms." *Id.* at 216. Further, where the facts show that the parties intended to be bound at some point in their negotiations before execution of a formal contract, they will not be bound unless there is agreement as to the basic terms of the undertaking. See *Geo. W. Wilcox, Inc.* v. *Shell E. Petroleum Prod., Inc.*, 283 Mass. 383, 387, 390 (1933). There must be agreement on the essential terms of the transaction in order that the nature and extent of the parties' obligations can be determined and, hence, enforced. See *Simons* v. *American Dry Ginger Ale Co.*, 335 Mass. 521, 525-526 (1957).

Applying these principles to the facts found by the judge "together with the inferences that ought to be drawn from them," *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 627 (1979), we conclude that in all the circumstances of the transaction Boston and Home entered into a binding agreement with Wexler on September 2, 1981. We think it obvious from the statements of the parties on that date, the very magnitude of the undertaking, the parties' correspondence subsequent to September 2, and the two drafts of the contract, that they intended to execute a formal contract. It does not, however, follow conclusively from that fact that the parties did not intend to be mutually bound to the terms agreed upon on that date until such time as the formal contract was executed. *Rosenfield* v. *United States Trust Co.*, 290 Mass. at 216.

Wexler had been advised as early as January, 1981, that it was to be the general contractor on the project. The parties met frequently, and Wexler worked with members of Vitols in coming up with architectural and structural drawings and a detailed book of specifications. Subcontractors had submitted prices to Wexler. Materials were to be ordered to insure timely delivery as the project was on a "fast track." That was the ongoing state of affairs when the parties shook hands. There-

after, on September 15, 1981, and January 6, 1982, drafts of the contract were submitted but not signed. Notwithstanding the fact that the September 15th draft of the contract (which was virtually identical in all material respects to the second) was not executed, Wexler was given authorization to order the structural steel. Wexler arranged for the issuance of a bond, assigned a project manager to the job, arranged for placement of a trailer on the job site, made oral subcontract awards, did exploratory site work, and obtained a building permit with funds from Stackhouse. Boston and Home executed their joint venture agreement and obtained a loan commitment for the project from the Provident. On January 29, 1982, King forwarded a copy of Wexler's brochure to Home's president with a cover letter identifying Wexler as "our general contractor" and stating that "I am submitting this to you because you requested information regarding the general contractor." See *Martino* v. *First Natl. Bank*, 361 Mass. 325, 332 (1972), quoting from *Pittsfield & No. Adams R.R.* v. *Boston & Albany R.R.*, 260 Mass. 390, 398 (1927) ("There is no surer way to find out what parties meant, than to see what they have done"). See also *Plunkett* v. *First Fed. Sav. & Loan Assn.*, 18 Mass. App. Ct. 294, 302-303 (1984); *Keating* v. *Stadium Management Corp.*, 24 Mass. App. Ct. 246, 251-252 (1987).

In addition to the parties' actions before and after September 2, 1981, their negotiations of that date bespeak finality. See *Rosenfield* v. *United States Trust Co.*, 290 Mass. at 216. The parties had available to them at that meeting the drawings and specifications which set out the general conditions of the construction. There was a cost estimate list, dated September 2, 1981, setting out over thirty items, reflecting changes in prices estimated on June 2, 1981, and showing deletions of some items to reduce costs. According to Kenneth Wexler's testimony, these costs were discussed at length and in detail. The parties arrived at a guaranteed contract price, Wexler's fee, retainage terms, allocation of cost-savings, and commencement and completion dates. Those terms appear in the two drafts of the unsigned contracts.

Each case turns on its own facts. The parties were well beyond "imperfect negotiation" and working out the "rudiments of . . . [their] deal." *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. at 627, 630. The preliminaries had been completed, the essential terms of the agreement had been reached, and the parties thereafter engaged in activities consistent with their agreement. See *White Spot Constr. Corp.* v. *Jet Spray Cooler, Inc.*, 344 Mass. 632, 633-634 (1962). Compare *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. at 628-630; *Held* v. *Zamparelli*, 13 Mass. App. Ct. 957, 958 (1982). We conclude that the agreement was binding.

(b) *The Statute of Frauds.*[5] It must now be determined whether the binding agreement is enforceable. Arguing in the alternative, Boston and Home claim that if there was an agreement between them and Wexler, it could not be fully performed within one year, and, therefore, any oral agreement was unenforceable under G. L. c. 259, § 1, Fifth.[6] They point to evidence which shows that the parties contemplated that construction would commence on October 1, 1981, on a "fast-track" basis and be substantially completed no later than October 30, 1982.

There is nothing in the evidence, however, which shows that the parties agreed that the construction was *not* to be completed before October 30, 1982, as contrasted with their agreement and understanding that it *could* take over twelve months to complete the job. See *Peters* v. *Westborough*, 19 Pick. 364, 367 (1837) ("[I]n order to bring a parol agreement within the clause of the statute in question, it must either have been expressly stipulated by the parties, or it must appear to have been so understood by them, that the agreement was not

---

[5] Wexler's contention that we should not consider this defense because Boston and Home did not affirmatively set it out in their answers to the cross claim is without merit in view of the motion to amend.

[6] General Laws c. 259, § 1, reads, in pertinent part: "No action shall be brought: . . . Fifth, Upon an agreement that is not to be performed within one year from the making thereof; Unless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized." There is no writing in this case which would satisfy the statute if it is found to apply.

to be performed within a year"); *Bolton* v. *Van Heusen*, 249 Mass. 503, 506 (1924) ("The agreement in conceivable circumstances might have been performed within a year. When it does not appear that a contract cannot in any event be performed within a year, then it is not within the statute of frauds and need not be in writing. That statute does not apply to contracts which may be performed within, although they may also extend beyond, that period"); *Joseph Martin, Inc*. v. *McNulty*, 300 Mass. 573, 577 (1938), explaining and quoting from *Peters* v. *Westborough*, 19 Pick. at 367 ("[A]ny understanding that the agreement was not to be performed within a year 'is to be absolute and certain, and not to depend on any contingency' "). Compare *Richard Tucker Associates, Inc*. v. *Smith*, 395 Mass. at 650 ("We discern no basis for concluding that the agreement in this case could have been performed within one year. The agreement called for the plaintiff to assist in arranging a lease of the defendants' property for a period of years. The parties clearly contemplated that the lease should continue for more than one year, and probably for at least three years").

Although it does not appear that the agreement required Wexler to complete the job within a year, neither does it appear that the parties expressly agreed that Wexler would not finish within that period. Rather, all the evidence shows that Boston and Home wanted the construction completed as soon as possible and, at the outside, by October 30, 1982. The faster the job was done, the happier Boston and Home would be. The agreement is not within G. L. c. 259, § 1, Fifth.

## IV. *Damages*.

There are two components to the damages awarded Wexler: (a) the fee that it would have earned had it been permitted to complete the contract, $200,000;[7] and (b) its cost of the labor

---

[7] The judge found that had Wexler been allowed to complete its contract, it would have incurred reimbursable costs of $4,000,000 and would have been entitled to a fee of six percent of those costs ($240,000), less office overhead ($40,000), that is, $200,000.

performed and materials furnished, $15,995. Boston and Home claim error as to each.

(a) *The fee*. Upon appropriate proof, Wexler is entitled to recover its fee. Predictably, the argument is that Wexler's proof (of what the cost of construction would be) was speculative. See *White Spot Constr. Corp.* v. *Jet Spray Cooler, Inc.*, 344 Mass. at 635, quoting from *John Hetherington & Sons, Ltd.* v. *William Firth Co.*, 210 Mass. 8, 21-22 (1911): " '[R]ecovery can be had where loss of profits is the proximate result of the breach, . . . and where it can be determined as a practical matter with a fair degree of certainty what the profits would have been. But profits cannot be recovered . . . when they are remote, or so uncertain, contingent, or speculative as not to be susceptible of trustworthy proof. They must be capable of ascertainment by reference to some definite standard, either of market value, established experience or direct inference from known circumstances.' "

We see major differences rather than similarities between Wexler's proof and that of the plaintiff in *White Spot Constr. Corp.* v. *Jet Spray Cooler, Inc.*, 344 Mass. at 635-636. All that was presented in that case were three estimates made by the plaintiff and the cost of the completed building, which was not shown to be "similar to the contemplated structure which . . . [the plaintiff] purported to estimate." *Id.* at 636. Here Wexler presented, in addition to his testimony, the price list of September 2, 1981. That list was analyzed in detail on that date by Kenneth Wexler, Stackhouse, and King, who had the plans, drawings, specifications, and general conditions available to them at that time and who made certain deletions of items from the list to reduce the total estimated cost. As best we can discern from the somewhat blurred copy of that list presented in the record appendix, the total estimated cost of the items listed was $4,355,188 which included an amount of $244,723 which was labelled "Overhead & Profit 6%." The parties orally agreed that the guaranteed maximum price of the contract (costs plus fee) was $4,255,000. Further, there was evidence to show that on January 29, 1982, Boston and Home sought from the Provident a revised loan commitment

(up from $5,500,000 to $5,755,000). In a "budgeted projected cost schedule" attached to their request, "construction" is listed at $4,155,000. On this evidence we see no error in the judge's conclusion that the amount of Wexler's fee had been established with a fair degree of certainty and rested upon a solid foundation in fact.

(b) *Labor and materials.* Here the argument is that Wexler is not entitled to recover its out-of-pocket costs because, if it is concluded that there is an enforceable oral contract, the terms of that contract preclude recovery. The argument focuses upon the two drafts of the contract which were never signed but which, according to Kenneth Wexler's testimony, incorporated all the terms and details of the "deal" of September 2, 1981.[8]

Under the terms of the written contract, Wexler would be entitled to reimbursement of certain specified out-of-pocket costs incurred in its performance of the work to be done for Boston and Home. The contract defines the "work" as "Construction of . . . North End Condominiums." Because actual construction was never commenced, through no fault of Wexler's, the claim is that none of Wexler's out-of-pocket costs are reimbursable. This argument fails for the reason, if no other, that the contract also provides that "[t]he term Cost of the Work shall mean costs necessarily incurred in the proper performance of the Work and paid by the Contractor." As itemized and explained by Kenneth Wexler at trial, each of the expenditures at issue was incurred by Wexler in preparation for its performance of the work to be done in building the condominium complex for Boston and Home. We think it reasonable to conclude that, if work is to be performed properly, a certain amount of preparation is anticipated and expected.

There is an additional argument in respect to one cost item, an amount of $9,600 for services provided by a Wexler employee assigned as the project manager on the job. Under the terms of the contract, salaries and expenses related to Wexler's

---

[8] Kenneth Wexler also testified that the fact that neither draft was ever signed had nothing to do with the wording or content of the drafts.

personnel were not to be reimbursed where the work was performed at Wexler's "principal office," whereas, if performed by personnel "stationed at the field office," salary and expenses would be reimbursed. It is argued that Kenneth Wexler admitted at trial that the project manager worked out of the principal office.

This synopsis of Kenneth Wexler's testimony is not entirely accurate. What he stated is as follows: In late September or early October, 1981, he pulled the project manager from his other jobs and assigned him to the present project. The project manager was to be "stationed at the field office," that is, he was to work at the site from a trailer. As explained by Wexler, the project manager went to the work site "innumerable times" but was required to return to the office to work on the project. The reason for this was that Wexler's trailer was to be located on the existing parking lot at the site. However, Stackhouse would not empty the lot to accommodate the trailer. Wexler repeatedly asked Stackhouse to empty the lot, and Stackhouse would assure him that the lot would be clear the next day. The project manager would then go to the lot and find that it had not been readied for him, and he would return to Wexler's office to do his work. On these facts and under the terms of the agreement, we see no error in the judge's inclusion of this portion of Wexler's out-of-pocket costs.

In light of our conclusion, we need not consider the claim that Wexler incurred the disputed out-of-pocket costs for its own benefit and that it is, therefore, precluded from recovering damages under the theory of quantum meruit. Were we to reach that issue, we would conclude that, on the facts found by the judge, it would be fair and equitable to allow Wexler to recover its out-of-pocket costs as they were incurred for the benefit of Boston and Home with the reasonable expectation by all the parties that Wexler would be reimbursed. See generally *Salamon* v. *Terra*, 394 Mass. 857 (1985).

*Judgment affirmed.*