MacLeod, J.
The plaintiffs, Realty Central LLC (“Realty Central”), Karmichael Really, Inc. (“Karmichael Realty”), and Michael Venditto (“M. Venditto”) (collectively “plaintiffs”), brought this action against the defendant Re/Max of New England, Inc. (“Re/Max”) alleging Breach of Oral Contract (Count I), Breach of Written Contract (Count II), Promissory Estoppel (Count III), Intentional Misrepresentation (Count IV), Negligent Misrepresentation (Count V), Violation of G.L.c. 93A (Count VI), and Breach oflmplied Covenant of Good Faith and Fair Dealing (Count VII) with respect to a Re/Max franchise agreement. This matter is now before the Court on Re/Max’s motion for summary judgment on all counts of the plaintiffs’ complaint. For the reasons set forth below, Re/Max’s motion for summary judgment is ALLOWED.

BACKGROUND

In 1999, M. Venditto[2] and his sister Karen Venditto (“K. Venditto”)[3] contacted Jay Hummer (“Hummer”), Re/Max’s Vice President of Franchise Development, about franchise opportunities.[4] As required by law, Hummer provided the Vendittos a copy of Re/Max’s Uniform Franchise Offering Circular (“Offering Circular”). The Offering Circular provided detailed information to applicants about Re/Max and the process of becoming a franchisee. The Vendittos reviewed the *710 materials, including a model of the Re/Max franchise agreement, but an agreement with Re/Max did not develop at that time.
In February 2002, the Vendittos renewed discussions with Hummer about opening a Re/Max franchise in Revere. Over the course of the following two months, the Vendittos and Hummer discussed terms of a Re/Max franchise. During these discussions, the Vendittos expressed an interest in securing an exclusivity provision, which would preclude another Re/Max franchise from competing for the Revere territory. Initially, Hummer stated that he did not think that exclusivity would be a problem. Thereafter, M. Venditto created a company, Realty Central to serve as the Re/Max franchisee.
In anticipation of opening a Re/Max franchise, K. Venditto started recruiting sales associates and ordered signs and barrels with the Re/Max name on them. M. Venditto incurred legal fees in the creation of Realty Central as well as for drafting new compensation structures for management. In addition, M. Venditto claims to have released two tenants from leases in his building, in order that the space might be used for additional Re/Max brokers.
During the course of the parties’ discussions, several documents were forwarded to the Vendittos, including a 2002 Offering Circular, a confidential information worksheet, and a draft of a franchise agreement (“Franchise Agreement”) with the name and location proposed by the Vendittos and the sales associate quotas that would be expected by Re/Max. According to the Franchise Agreement, the submission of the draft was not an offer. Specifically, the Franchise Agreement states, in relevant part,
17. SUBMISSION OF AGREEMENT
THE SUBMISSION OF THIS AGREEMENT TO YOU DOES NOT CONSTITUTE AN OFFER AND THIS AGREEMENT SHALL BECOME EFFECTIVE ONLY UPON ITS EXECUTION BY YOU AND US. THIS AGREEMENT SHALL NOT BE BINDING ON US UNLESS AND UNTIL IT IS ACCEPTED BY US, THAT IS, SIGNED BY OUR AUTHORIZED OFFICER AND RETURNED TO YOU.
RE/MAX FRANCISEE*
RE/MAX OF NEW ENGLAND, INC. Really Central, Inc.
By:-
H. Charles Lemire, Jr.
Regional Director
8 Strathmore Road
STREET ADDRESS
Natick. Massachusetts 01760
CITY, STATE, ZIP
DATE
By: s/ Michael J. Venditto
Michael J. Venditto, Jr.
701 Broadway
STREET ADDRESS
Revere. MA 02151
CITY, STATE, ZIP
s/ April 9. 2002
DATE
*Franchisee and all Owners must sign and date this page.
Franchise Agreement, §17, p. 44. In addition, an addendum was attached which would grant the Vendittos an exclusive Re/Max franchise. The addendum states, in relevant part,
RE/MAX agrees that, during the Term of the Franchise Agreement, RE/MAX will not enter any additional RE/MAX residential franchise agreements within the city of Revere, Massachusetts (the “Reserved Territory”), other than (a) the RE/MAX franchise that is the subject of the Franchise Agreement, and (b) any sale or other transfer of said RE/MAX franchise.
This letter shall be deemed to be part of the Franchise Agreement and is hereby incorporated into the Franchise Agreement as if originally set forth therein.
Very truly yours,
H. Charles Lemire, Jr. Regional Director
ACCEPTED AND AGREED TO
As of the 9th day of April 2002
Franchisee:
Really Central, Inc.
By: s/ Michael Venditti President
Exclusivity Agreement, p. 2.
On or about April 9, 2002, Hummer called K. Venditto and informed her that Re/Max could not grant the Vendittos the exclusivity agreement as there was another broker with whom Re/Max had previously begun negotiating about a Revere franchise. Hummer also explained that as a result, Re/Max could only offer a non-exclusive franchise in Revere. Notwithstanding, Hummer offered to waive the franchise fee for an exclusive franchise in Everett in addition to the Revere non-exclusive franchise. Hummer made it quite clear that Re/Max could no longer offer an exclusive Revere franchise.
Nevertheless, on or about April 11, 2002, M. Venditto delivered the previously received Franchise Agreement and Exclusivity Agreement, fully executed by him, to Re/Max, with the required franchise fee.[5] Ultimately, H. Charles Lemire never signed the Franchise Agreement or the Exclusivity Agreement on behalf of Re/Max.[6]
Having failed to obtain an exclusive Revere franchise, the plaintiffs filed this claim.

DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating that there are no triable issues, and that the summary judgment record entitles the moving *711 party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
I. Breach of Contract — Written (Count II)
The plaintiffs claim that Re/Max entered into a binding written agreement with respect to an exclusive Re/Max franchise. To create an enforceable contract, there must be an agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement. Situation Management Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000); McCarthy v. Tobin, 429 Mass. 84, 87 (1999) (noting that “(t]he controlling fact is the intention of the parties”). “It is a settled principle of contract law that a promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract.” Schwanbeck v. Federal-Nogul Corp., 412 Mass. 703, 706 (1992).
The plaintiffs rely on the Franchise Agreement signed by M. Venditto as evidence of a binding contract. However, as stated above, the Franchise Agreement expressly states,
17. SUBMISSION OF AGREEMENT
THE SUBMISSION OF THIS AGREEMENT TO YOU DOES NOT CONSTITUTE AN OFFER AND THIS AGREEMENT SHALL BECOME EFFECTIVE ONLY UPON ITS EXECUTION BY YOU AND US. THIS AGREEMENT SHALL NOT BE BINDING ON US UNLESS AND UNTIL IT IS ACCEPTED BY US, THAT IS, SIGNED BY OUR AUTHORIZED OFFICER AND RETURNED TO YOU.
Franchise Agreement, §17, p. 44. Undisputed is the fact that no “authorized officer” of Re/Max, nor anyone from Re/Max ever signed the Franchise Agreement or returned the executed agreement to the plaintiffs. It is clear from the language of the Franchise Agreement that Re/Max did not intend to be bound by the signature of the plaintiff alone, but rather contemplated and required an “authorized officer” to sign and return the Franchise Agreement to the franchisee. A written agreement is ineffective if it remains unaccepted by a party. Laprade v. Fitchburg & L. St. Ry. Co. 205 Mass. 77, 79 (1910).
To accept the plaintiffs’ argument that the exchange of the draft was an offer which they accepted upon the signing and submission of the franchise fee would be in conflict with well-established contract principles. “Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements.” Tull v. Mister Donut Dev. Corp., 7 Mass.App.Ct. 626, 632 (1979). Moreover, language looking to the execution of a final agreement, i.e., the signatures of both parties, justifies the strong inference that the parties do not intend to be bound. Goren v. Royal Invs, Inc., 25 Mass.App.Ct. 137, 140 (1987).
At the outset of the February 2002 discussions, the plaintiffs received a 2002 Offering Circular from Re/Max. Included therein was a model franchise agreement which the plaintiffs acknowledge to have reviewed. This model agreement was exactly the same as the Franchise Agreement they now rely upon as a binding contract.[7] It too contained the section “17. Submission of Agreement” provision.
Clearly, based upon section 17, Re/Max did not intend the draft Franchise Agreement to be an offer. The words are unambiguous, “THE SUBMISSION OF THIS AGREEMENT TO YOU DOES NOT CONSTITUTE AN OFFER ...” Thus, this Court finds that it would be unreasonable for the plaintiffs to believe that the Franchise Agreement would become binding upon one parly’s signature given that section 17 also states, “THIS AGREEMENT SHALL BECOME EFFECTIVE ONLY UPON ITS EXECUTION BY YOU AND US. THIS AGREEMENT SHALL NOT BE BINDING ON US UNLESS AND UNTIL IT IS ACCEPTED BY US, THAT IS, SIGNED BY OUR AUTHORIZED OFFICER AND RETURNED TO YOU.”
In Celluci v. Sun Oil Co., an agreement was sent to a seller with a provision that the contract was “binding upon the Seller . . . when executed by the Seller, and is binding upon Buyer . . . only when executed by an official of Buyer.” 2 Mass.App.Ct. 722, 724 (1974). The Appeals Court held that although the draft was sent to the plaintiff, his execution of that document was merely an offer which the defendant had the power to accept or reject. Id. at 727. Here, there was clearly no acceptance by Re/Max in the manner called for by the Franchise Agreement.
Where the precise manner in which an agreement becomes binding is expressly stated, one cannot turn a blind eye or deaf ear to those instructions. M. Venditto initialed each and every page of the Franchise Agreement, signed the signature page, and is deemed to have understood and accepted each of the terms and conditions contained therein.
Re/Max, having never executed the Franchise Agreement in accordance with the terms set forth, has affirmatively demonstrated that there is no triable issue as to a written contract. For the reasons set forth above, Re/Max’s motion for summary judgment as to Count II is allowed.
II. Breach of Contract — Oral (Count I)
Since filing this suit, the plaintiffs have apparently changed positions with respect the term of the Franchise Agreement. The Franchise Agreement states, in relevant part,
*712 A.GRANT AND TERM OF FRANCHISE
The term of the Franchise will begin on the Agreement Date and continue for a period of 5 years (the “Term”), unless the Franchise is terminated earlier pursuant to the provisions of this Agreement. Termination or expiration of this Agreement will constitute termination or expiration of your Franchise.
Franchise Agreement, §2, pp. 2-3.
Initially, the plaintiffs did not dispute that the term of the Franchise Agreement was for a period of five years.[8] Now, however, the plaintiffs argue that the term of the Franchise Agreement was “forever,” casting aside their earlier contentions that the provisions of the contract were contained within the Franchise Agreement.[9]

A. Five (5) Year Term

Pursuant to the statute of frauds, a contract that cannot be performed within one year must be in writing. Situation Management Syst., Inc., 430 Mass. at 880, n. 1 (“Statute of Frauds requires any agreement not to be performed within one year to be in writing”). In the light most favorable to the plaintiffs, they cannot escape section 2 of the Franchise Agreement that expressly states the term to be five (5) years.
The plaintiffs nonetheless argue that although the Franchise Agreement states a term of five (5) years, the contract could be performed within one year because it could have been terminated within the first twelve months by death or disability of M. Venditto or K. Venditto, or if Re/Max went out of business. This argument fails. Where a contract expresses a definite period in excess of one year, it must be in writing. Meng v. Trustees of Boston Univ., 44 Mass.App.Ct. 650, 652 (1998). A party to the contract could die or go out of business within one year; either event would discharge the contract, but the contract would not have been fully performed. Id. at 652.

B.“Forever” Term

Assuming arguendo, that this Court could comprehend the plaintiffs’ blatant disregard of or willful blindness to section 2 of the Franchise Agreement, the oral contract claim must still fail as a matter of law. Pursuant to Massachusetts law, in order to have an enforceable contract, “there must be [an] agreement on the essential terms of the transaction in order that the nature and extent of the parties’ obligations can be determined and ... enforced.” Novel Iron Works Inc. v. Wexler Constr. Co., 26 Mass.App.Ct. 401, 408 (1988) (citations omitted).
According to K. Venditto, she assumed the oral agreement was for an “unlimited period of time” as the term was never discussed.[10] Moreover, M. Venditto testified that the term of the agreement was never agreed upon.[11] Yet, it is undisputed that the plaintiffs received and reviewed, on at least two occasions, the offering circulars of Re/Max which expressly lists certain “important provisions” of the franchise. Listed first within this section, it states, “(a) Term of Franchise ... 5 years.” Clearly, Re/Max considered the term of the franchise to be an “important provision,” including it several pieces of literature that the plaintiffs were told to read carefully and expected to understand.
Thus, even as alleged by the plaintiffs, the oral contract fails as the parties did not agree on an essential terms, i.e., the term of the agreement.

C.Plaintiffs Were Aware that There Was No Contract Without an Executed Franchise Agreement

Section 17 of the Franchise Agreement clearly indicates that there is no binding agreement unless and until an authorized officer of Re/Max signs and returns a copy of the Franchise Agreement to the plaintiffs. Moreover, M. Venditto testified that absent an executed agreement, no agreement was made. According to the undisputed testimony and evidence before this Court, (1) an authorized officer never signed the Franchise Agreement on behalf of Re/Max, and (2) a signed copy was never returned to the plaintiffs.
Ordinarily, the fact that parties contemplate the execution of a final agreement effects a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled. Rosenfeld v. United States Trust Co., 290 Mass. 210, 216 (1935); Situation Management Sys., Inc., 430 Mass. at 879-80. Such is the case here. Re/Max made it perfectly clear in the Franchise Agreement that it did not intend to be bound absent an executed written agreement. The plaintiffs cannot ignore the clear and obvious language in the Franchise Agreement in an attempt to circumvent its requirements.

D.Plaintiffs Equitable Estoppel Argument

The plaintiffs also argue estoppel in attempting to support their oral contract claim. For the plaintiffs to prevail, it must be shown that their acts or forbearance in reliance on any alleged oral contract were “definite and substantial” in character. Loranger Constr. Corp. v. E.F. Hauserman Co. 6 Mass.App.Ct. 152, 154 (1978). Here, the plaintiffs claim to have incurred costs for Re/Max signs, trash barrels, recruiting efforts, as well as lost rental income as a result of them terminating or failing to renew leases in anticipation of opening a Re/Max franchise.
However, upon review by this Court, any alleged costs incurred by the plaintiffs were not the result of reasonable reliance on any alleged oral contract. See Pappas Indus. Parks, Inc. v. Psarros, 24 Mass.App.Ct. 596, 599 (1987). It is clear from the record that the plaintiffs were aware or should have been aware of section 17 of the Franchise Agreement prior to having taken any steps alleged to have caused them damages. In addition, the evidence indicates that one of the tenants had already approached him about getting out *713 of the lease early.[12] The second tenant was asked to vacate the premises prior to Hummer’s alleged fraudulent misrepresentation that the plaintiffs had an agreement with Re/Max.[13] The circumstances were such that reasonable businessman would be aware that the negotiations were imperfect and that no presumed agreement could have been relied upon. See Tull, 7 Mass.App.Ct. at 630-32. In complex commercial transactions like this one, one must proceed with caution to prevent the transformation of general expressions of intent, when significant details remain to be resolved, into legally binding agreements. Id. “To the extent [the plaintiffs] took steps ... in anticipation that important parts of the transaction would fall into place, those were business risks which [the plaintiffs are] obliged to shoulder.” Id.
For the reasons set forth above, Re/Max’s motion for summaiy judgment as to Count I is allowed.
III. Breach of Covenant of Good Faith and Fair Dealing (Count VII)
To prevail on this claim, there must first be a binding contract. Anthony’s Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 471 (1991). The implied covenant of good faith and fair dealing between parties to a contract provides that “neither party shall do anything that will have the effect or destroying or injuring the right of the other party to receive the fruits of the contract.” AccuSoft Corp. v Palo, 237 F.3d 31, 45 (1st Cir. 2001). It is implicit in that definition that “the prohibition contained in the covenant applies only to conduct during performance of the contract, not to conduct occurring prior to the contract’s existence, such as conduct affecting contract negotiations. Id. Restatement (Second) of the Law of Contract §205, comment c (noting that bad faith in contract negotiations is not reached by the implied duty of good faith and fair dealing).
This Court has previously determined that there was no written or oral contract between the parties. Thus, in the absence of a contract, there can be no breach of the covenant of good faith and fair dealing. For the reasons set forth above, Re/Max’s motion for summaiy judgment as to Count VII is allowed.
IV. Misrepresentation — Intentional
(Count IV); Negligent (Count V)
In a common-law action for fraud, the plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with the plaintiffs’ reliance on the false statement to his detriment. Sahin v. Shain, 435 Mass. 396, 402 (2001); Kittner v. CTW Transp., Inc., 53 Mass.App.Ct. 741, 749 (2002); Ravosa v. Zais, 40 Mass.App.Ct. 47, 52 (1996). To succeed under either theory however, the plaintiff must establish that his reliance was reasonable or justifiable. Cole v. New England Mut. Life Ins. Co., 49 Mass.App.Ct 296, 300 (2000).
Viewing the facts in the light most favorable to the plaintiffs, the plaintiffs commenced negotiations with Re/Max in February 2002. Early on in negotiations, Hummer sent Re/Max’s Model Franchise Agreement to the Vendittos for their review. In subsequent conversations with the plaintiff, Hummer indicated that the only significant change between the 1999 and 2002 Model Franchise Agreement was that Re/Max was now only opening non-exclusive franchises. However, because the Vendittos had prior dealings with Re/Max in 1999, Hummer stated he could grant them an exclusive franchise. In March 2002, the Vendittos received the Franchise Agreement. On April 6, 2002, the Vendittos received a side letter setting forth the terms of the exclusivity. On April 9, 2002, Hummer contacted the Vendittos informing them that Re/Max could not offer them an exclusive franchise. On April 11,2002, the Vendittos delivered the Franchise Agreement and exclusivity letter, executed by K. Venditto under M. Venditto’s signature, to Re/Max with a check for $15,000.00. The plaintiffs contend that a valid contract was formed on the basis of Hummer’s representations of an exclusive franchise, the waiver of the formal application process, and his authority to grant an exclusive franchise.
However, “the recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.” Restatement (Second) ofTorts§541. “If a mere cursory glance would have disclosed the falsity or the representation, its falsity is regarded as obvious under the rule stated in §541.” Restatement (Second) of Torts §540, comment a.
Reliance on any statement or conduct of Hummer made during negotiations is unreasonable as a matter of law because it conflicted with the clear language of the Franchise Agreement, which states that “the submission of this agreement. . . does not constitute an offer” and that any contract required an acceptance by an “authorized officer” of Re/Max and a return of the executed agreement to the plaintiffs. See Kuwaiti Danish Computer Co. v. Digital Equip Corp., 438 Mass. 459, 468-70 (2003). As stated previously, it is undisputed that an “authorized officer” of Re/Max never signed the Franchise Agreement or returned a copy to the plaintiffs.
The evidence clearly establishes that the plaintiffs were alerted to any possible discrepancy between the alleged oral misrepresentations and the Franchise Agreement prior to executing the Franchise Agreement, both by Hummer’s phone call and in the express language of section 17. All that was required of the plaintiffs was that they read the document to ascertain the obvious. Moreover, there is no evidence that Hummer tried to conceal the fact that exclusivity was no longer an option, as he has personally called the plaintiffs to notify them of that development on April 9, 2002.
Even if the plaintiffs were to rely on Hummer’s representations that he had authority on behalf of Re/Max, *714 those assertions were contradicted by the language of the Franchise Agreement, as H. Charles Lemire, Jr. was the person designated to sign on behalf of Re/Max. After receipt of the Franchise Agreement in March 2002, any reliance upon Hummer’s representations would be unreasonable. Arguably, the plaintiffs should have been aware that Hummer could not have waived the formal application process upon receipt of the 2002 Offering Circular they admittedly received at the outset of their discussions with Re/Max. In the 2002 Offering Circular, the Model Franchise Agreement lists H. Charles Lemire, Jr., Re/Max’s regional director, and not Hummer as the “authorized officer.”
It should have been obvious to the plaintiffs that Hummer did not have the authority to make a contract. Any “expression of satisfaction at having reached a deal, was flickering ‘no deal’ by virtue of the qualifying language in [section 17].” Kuwaiti Danish Computer Co., 438 Mass. at 469.
The plaintiffs reliance upon the representations of Hummer were neither reasonable nor justifiable given the language in the Offering Circular and Franchise Agreement. For the reasons set forth above, Re/Max’s motion for summaiy judgment as to Counts IV and V is allowed.
V. Promissoxy Estoppel (Count III)
The essential factors giving rise to an estoppel are (1) a representation of conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; and (3) the detriment to such person as a consequence of the act or omission. Clickner v. City of Lowell, 422 Mass. 539, 544 (1996). For there to be an estoppel, a parly’s reliance upon a statement or action must be reasonable. O’Blenes v. Zoning Bd. of Appeals of Lynn, 397 Mass. 555, 558 (1986).
Having previously determined that the plaintiffs’ reliance was neither reasonable or justifiable in the face of the language in the Offering Circular and Franchise Agreement, Re/Max’s motion for summaiy judgment as to Counts III is allowed.
VI. Violation of M.G.L.c. 93A
The plaintiffs contend that Re/Max violated G.L.c. 93A based on its misrepresentations and breach of the exclusive Franchise Agreement.[14] Having failed to assert any other grounds upon which to support their violation of G.L.c. 93A, this Court shall address only those set forth by the plaintiffs.
To the extent that plaintiffs’ claim of a violation of G.L.c. 93A is derivative of their misrepresentation claims, this claim cannot survive. Macoviak v. Chase Home Mortgage Corp., 40 Mass.App.Ct. 755, 760-61 (1996) (stating that a plaintiff has no reasonable expectation of proving a c. 93A claim based solely upon an underlying claim for common-law fraud which has failed). To the extent that the claim is derivative of the plaintiffs’ breach of contract claims, it too cannot survive summaiy judgment.
This Court has previously awarded summaiy judgment in favor of the defendants as to Counts I, II, IV and V of the Complaint. For the foregoing reasons, this claim cannot stand alone. Therefore, Re/Max’s motion for summaiy judgment as to Count VI is allowed.

ORDER

For the foregoing reasons, it is hereby ORDERED that the Defendant’s motion for summaiy judgment is ALLOWED as to Counts I-VII.
As there are no claims which have survived summary judgment, Count VIII must be summarily DISMISSED.

Owner of Karmichael Realty, a real estate sales office specializing in the sale of residential and commercial real estate located in Revere, Massachusetts.

Manager of Karmichael Realty.

The court is considering the facts in the light most favorable to the non-moving party, as presented by the pleadings, affidavits, and stipulated facts, and as revealed by the summary judgment record.

Franchise fee in the amount of $15,000.00.

The plaintiffs do not argue or allege that Re/Max failed to return the franchise fee.

Except for the Franchise Agreement containing the name and location of the proposed Re/Max franchise.

Plaintiffs Realty Central, Inc.’s and Karmichael Realty’s Memorandum of Law in Support of Motion for Temporary Restraining Order, or in the Alternative, Preliminary Injunction, pp. 11-12, FN 13.

It has not escaped this Court’s attention that the plaintiffs attempt to support their breach of contract claims by offering two theories of recovery in complete contradiction to the other. First, the plaintiffs argue that they entered into a binding written contract with Re/Max that expressly stated the terms, including that the term of the agreement was for five (5) years. Second, they argue that they entered into a binding oral contract with Re/Max in which the term of the agreement lasted in perpetuity, i.e., “forever,” if quotas were met. Thus, it is the plaintiffs’ argument that they entered into two binding agreements with Re/Max, each of which is entirely inconsistent with the other with respect to the term of the agreement. Such a result would be contrary to well-established principles of law.

Plaintiffs’ Responses to Defendant’s First Set of Interrogatories, No. 9; Depo. of K. Venditto, pp 246, 248-50, & 257-58.

Stating that the only three terms upon which the parties allegedly reached an oral agreement were exclusivity, sales quotas, and the franchise fee. Depo. of M. Venditto, pp. 97, 100, & 105-07.

The lease was to expire a few months later. Depo. of M. Venditto, pp. 153-54.

Depo. of M. Venditto, pp. 154-55.

Plaintiff Really Central, LLC, Karmichael Realty, Inc., and Michael Venditto’s Opposition to Defendant’s Motion for Summary Judgment, p. 18.