van Gestel, J.
This matter is before the Court on a motion for summaiy judgment (Paper #13), by the defendant, EMC Corporation (“EMC”). The Amended Complaint contains seven counts, as follows: Count I, breach of contract (UCC); Count II, breach of contract (CISG); Count III, promissoiy estoppel; Count IV, *140 breach of covenant of good faith and fair dealing; Count V, quantum meruit; Count VI, unjust enrichment; and Count VII, violation of G.L.c. 93A.
At heart, what is involved is a claimed breach of an oral contract.
BACKGROUND
The following facts are recited in the light most favorable to the non-moving parties.
EMC is a Massachusetts corporation, based in Hopkinton, Massachusetts.
Vision Systems, Inc. (“VSI”) is a Maiyland corporation qualified to do business in Massachusetts, once located in Hingham and now located in Norwell, Massachusetts.
Vision Fire & Security Pty, Ltd. (“VFS”) is an Australian corporation, with its principal place of business in Mt. Waverley, Victoria, Australia.
VSI and VFS will collectively be called “Vision” in this memorandum, unless they need to be individually identified.
EMC was introduced to Vision after Vision learned of a potential to sell smoke detection units (“SDUs”) to EMC for integration into EMC’s Symmetrix 5 (“Symm 5”) data storage system. EMC’s first contact was with Ronald D. Ouimette (“Ouimette”), a business development executive employed by VSI. Ouimette was directly responsible for developing the business relationship between Vision and EMC. Thereafter, EMC began purchasing SDUs from Vision, and integrating them into EMC’s Symm 5s.
Ouimette remained Vision’s principal contact with EMC. He was the “Account Manager for EMC,” and was EMC’s main contact person for “orders, deliveries, etc.”
James Rose, another VSI employee, was principally responsible for various engineering issues relating to the integration of Vision’s products into EMC’s data storage systems. He was the only other Vision employee in regular contact with EMC.
Price quotations to EMC were provided by VSI. Sales to EMC were to be “F.O.B Hingham, MA.” Orders from EMC were submitted to VSI at its Hingham office.
In November 2000, EMC informed Vision that it was developing a new mass storage device called Sym-metrix 6 (“Symm 6”). With EMC’s knowledge, Vision designed a new SDU system for the Symm 6. At that time, certain EMC employees traveled to Australia. The primary purpose of the trip was for EMC to conduct a vendor audit, inspecting the manufacturing capabilities and quality of VFS. EMC was aware that all of Vision’s research, development and manufacturing was performed in Australia.
By July 2001, Vision hoped that it could use the new SDU as the basis for a product line for sale to other manufacturers of high-tech equipment, in addition to EMC. EMC is said to have constantly assured Vision that EMC would buy the Symm 6 SDUs at a volume and price that would allow Vision to recoup all of the research and development costs attributable to the Symm 6 project.
Vision and EMC then began negotiating a contract for the purchase and sale of SDUs, including the new SDU for the Symm 6 system. Both companies intended the written contract to govern any purchases and sales between them. Negotiations proceeded over a period of many months, and numerous drafts of complex written contracts were exchanged between the parties over nearly a year. No final agreement was ever reached, however, and no written contract was ever executed.
Vision’s research and design efforts were successful, and EMC, despite the lack of a written contract, began purchasing production units of the new SDUs for inclusion into the Symm 6 date storage devices.
In the spring of 2002 EMC requested pricing options based on EMC’s up-front payment of some or all of Vision’s research and development costs to obtain lower per-unit cost for the Symm 6 SDU. The research and development costs were substantial, said to have amounted to approximately $2.59 million.
On June 10, 2002, Ouimette sent to EMC an e-mail setting forth certain NRE[2] payment options. Because of its significance to one of the elements in this case, the cover memorandum and key parts of the document enclosed are set forth here.
Ouimette’s cover memorandum reads, in its entirety;
Jack,
As promised see the attached document. Please run it up the flagpole and let me know what you think. I will call you to discuss.
Best Regards,
Ron Ouimette.
The “attached document” reads, in material part, as follows:
Thank you for meeting with David Lloyd and me. I believe the meeting was productive. Based on our discussions we are taking an optimistic look at the future growth and volume with EMC for the SYM 6 cabinets and possible migration into the Clarion family. That said and based on your projections of 2,300 SDUs per year we are moving EMC into the next improved pricing category as indicated in the table below. A summary of our meeting follows:
1. Volume of SYM 6 SDU is significantly less than originally projected 9K+ per year, now 2,300 per year. . .
2. Based on the new conservative forecast of 2,300 SDU per year we have formulated a price schedule that considers a non-NRE scenario and an NRE scenario amortized over a period of 3 years.
3. . . .
*141 4. . . .
5. . . . Whether EMC elects an NRE or non-NRE route the volume dollar breaks will be in effect according to the original table.

Notes:

The Special price above is based upon EMC projected annual volume of 2300 units.
If Vision does not receive a purchase order for NRE before June 30, 2002 then the unit pricing will be in line with the 2501 to 5000 unit quantity.
(Emphasis added, except for the word “Notes.”)
EMC never issued an NRE purchase order, nor did it reject the summary of the meeting in writing or otherwise. Instead, EMC proceeded to begin ordering Symm 6 SDUs at $700 per unit.
EMC informed Vision in November 2002, that it intended to discontinue all further purchases of SDUs. At that time EMC had purchased 1,247 production units of the Symm 6 SDUs, paying an aggregate sum of $872,900 therefor. These 1,247 production units were all that Vision had manufactured at the time EMC stopped purchasing.
DISCUSSION
“Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmov-ing party, all material facts have been established and the moving party is entitled to judgment as a matter of law.” M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 89 (2004); Kesler v. Pritchard, 362 Mass. 132, 134 (1972). Mass.R-Civ.P. Rule 56(c).
The burden of proof at trial is on Vision as to all elements of its claims. Further, although EMC as the moving party here has the burden of showing that there are no material facts in dispute, it can satisfy that burden by demonstrating that Vision has no reasonable expectation of proving an essential element at trial. Flesner v. Communication Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “Bare assertions and conclusions . . . are not enough to withstand a well-pleaded motion for summary judgment.” Polaroid Corp. v. Rollins Environmental Services, Inc., 416 Mass. 684, 696 (1993). Vision cannot rest on its pleadings and mere unsupported assertions of disputed facts to defeat EMC’s motion. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
In EMC’s Reply to Vision’s Opposition to Motion for Summary Judgment, Paper #16, the stage is set for this discussion.
Plaintiffs advance an array of oral contract, quasi-contract and estoppel theories all constructed on the disputed factual premise — which for purposes of this summary judgment motion, is assumed to be true — that EMC “promised” to purchase 2,300 SDUs per year for three years at a price of $700 per SDU.
Count I
EMC begins its challenge to Vision’s case with a citation to the Statute of Frauds as it applies to the sale of goods under the Uniform Commercial Code (“UCC”), found at G.L.c. 106, sec. 2-201(1), (2) and (3) (a):
(1) Except as otherwise provided in this section a contract for the sale of goods for a price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker . . .
(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.
(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable
(a) if the goods are to be specifically manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller’s business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement. . .
Vision does not challenge EMC’s position that there is no “writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.” Thus subsection (1) is not, for that reason, satisfied.
The Court next turns to subsection (2). Certainly both EMC and Vision fall within the definition of “merchants” as that word is used in subsection (2). See G.L.c. 106, sec. 2-104(1).
The First Amended Complaint contains allegations implying that an oral agreement was reached in June 2002, between EMC and Vision, whereby EMC was to purchase 2,300 SDUs per year for the Symm 6, for three years, at a price of $700 per unit. See, e.g., Amended Complaint paras. 41, 42 and 43. The Court must look for “a writing in confirmation of the contract and sufficient against the sender.” Vision, in its Memorandum in Opposition to EMC’s motion, at p. 6, discusses a June 7,2002 meeting, followed three days thereafter with an e-mail from Ouimette “setting forth the NRE payment options discussed.” Vision then proceeds to argue that the “document [the e-mail] confirms the parties’ agreement that if EMC did not *142 select one of the NRE options by issuing a purchase order, that the ‘no NRE’ pricing of $700 per unit would apply to the 2,300 units per year.” The document that Vision cites to is the June 10, 2002, e-mail cover memorandum and attached document quoted above at p. 4.
To comply with subsection (2) of G.L.c. 106, sec. 2-201 the writing, among other things, must be “in confirmation of the contract.” The June 10, 2002 e-mail does not meet that requirement for at least two reasons.
First, the cover memorandum part of the e-mail states: “As promised see the attached document. Please run it up the flagpole and let me know what you think. I will call you to discuss.” This is not language indicating that a contract for sale has been made. Rather, it is, at best, an invitation to offer from Vision to EMC to be considered and accepted, modified or rejected. The “run it up the flag pole and let me know what you think” language can have no other meaning. See, e.g., Kuwaiti Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459, 464-66 (2003).
Second, the document attached with the e-mail is full of tentative and qualifying language. It speaks of “projections,” “forecasts” and “elections” by EMC. See the emphasized words above at p. 4.
The June 10, 2002 e-mail is not a confirmation of a contract. Thus, the subsection (2) exception to the subsection (1) Statute of Frauds prohibition is not met in this case.
Subsection (3) provides another exception for “goods ... to be specifically manufactured for the buyer and . . . not suitable for sale to others in the ordinary course of the seller’s business ...” This exception applies if “the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made ... a substantial beginning of their manufacture ...”
The SDUs designed and manufactured by Vision to be included in the Symm 6 mass storage device, consistent with the strict specifications therefor imposed by EMC, made these SDUs fall within the “specifically manufactured for the buyer and . . . not suitable for sales to others” language in subsection (3). What remains to be interpreted is the issue of whether Vision “made a substantial beginning of their manufacture.”
The law is sparse on this issue. EMC points to Chambers Steel Engraving Corporation v. Tambrands, Inc., 895 F.2d 858 (1st Cir. 1990), as support for its position that there was no substantial beginning of the manufacture of SDUs. Vision, on the other hand, argues that it manufactured and sold to EMC 1,247 production units of the Symm 6 SDUs. Vision points out, and EMC does not disagree, that EMC payed an aggregate sum of $872,900 for the 1,247 units. Further, there is no disagreement that these 1,247 production units were all that Vision had manufactured at the time EMC stopped purchasing.
The question of whether the undisputed facts establish, or fail to establish, a “substantial beginning of performance” is a question of law for the Court to decide. Chambers Steel at 860.
Chambers Steel does not carry the day for either side. A significant holding therein is that designing, developing and manufacturing a “prototype” of a special embossing machine was not enough to constitute a substantial beginning of a putative oral contract. Id. at 860-61. Vision went well beyond manufacturing a prototype; it manufactured 1,247 production units, and EMC bought them.
The trial judge in Chambers Steel relied upon Epprecht v. IBM Corp., 36 U.C.C. Rep. Serv. 391 (E.D.Pa. 1983). Epprecht is not wholly helpful either. In it, the plaintiff contended that the actual production of 7,000 specially made parts would allow proof of an oral contract for 50,000 of such parts.
The Court in Epprecht found the plaintiffs argument to be “both illogical and inconsistent with the reasoning” of the Pennsylvania state law construing and applying the statute of frauds provisions of the U.C.C. The Epprecht Court did, however, allow the plaintiff to enforce the oral contract for the 7,000 parts for which there was actual production. The language used in Epprecht, with which this Court agrees, is:
The quantity of goods to be produced under a contract is a critical term that cannot be inferred by a court. Where a party admits the existence of an oral contract, it is enforceable but not beyond the quantity of the goods admitted. The production of seven thousand specially manufactured parts in this case clearly would remove an oral contract for seven thousand parts from the statute of frauds. Since, however, there is no evidence of any “substantial beginning” made by [the plaintiff] on the remaining forty-three thousand parts, I am persuaded that the statute of frauds is applicable to the remainder of the oral contract for fifty thousand printhead assemblies.
Similarly here, this Court is persuaded that the production by Vision of 1,247 production units of the Symm 6 SDUs is a contract that is removed from the statute of frauds, but there is no substantial beginning by Vision on the 5,653 production units that were not actually manufactured, and would have been needed to make up the 6,900 supposedly contracted for. See, e.g., EMSG Sys. Div., Inc. v. Mittapie Corp., 37 U.C.C. Rep. Serv.2d 39, 44 (E.D.N.C. 1998).
Since EMC has already paid an aggregate sum of $872,900 for the 1,247 units, the oral contract for those SDUs has been satisfied in full. There is, therefore, no breach of the oral contract for 1,247 units, *143 and any enforcement of an oral contract for 5,653 additional units is barred by the Statute of Frauds. Count I must be dismissed.
Count II
Count II is grounded upon the United Nations Convention On Contracts for the International Sale of Goods (“CISG”). CISG is an international version of the Uniform Commercial Code. See 1 William A. Hancock, Guide to the International Sale of Goods Convention, sec. 100.002 (2002). Vision points to CISG because, unlike the U.C.C., it has no Statute of Frauds provision.
CISG, however, applies to contracts for the sale of goods made between buyers and sellers in different countries. “This Convention applies to contracts of sale of goods between parties whose places of business are in different States: (a) when the States are Contracting States . . . : CISG, Art. 1(1) (a) ‘Contracting State’ is a country which is a signatory to CISG.” The international component is a jurisdictional prerequisite to the application of CISG. Assante Tech, Inc. v. PMC-Sierra, Inc., 164 F.Sup.2d 1142, 1147 (N.D.Cal. 2001).
Contracts between a United States company, like EMC here, and the United States subsidiary of a foreign company, like VSI here, “do not fall within the ambit of the CISG.” Hancock, sec. 101.006. Similarly, CISG does not apply to the sale of goods between parties if one party has “multiple business locations” unless it is shown that that party’s international location “has the closest relationship to the contract and its performance.” Id. at sec. 101.005.[3]
Here, EMC is an American corporation, based in Hopkinton, Massachusetts. Vision, with which EMC was dealing, is multi-national, with entities such as VFS within its corporate family in Australia and entities like VSI, also an American corporation, located in Massachusetts. The center of gravity of the transaction, however, seems clearly in Massachusetts. As noted above, EMC’s first contact with Vision was with Ronald Ouimette, a business development executive employed by VSI. Ouimette was directly responsible for developing the business relationship between Vision and EMC. Ouimette remained Vision’s principal contact with EMC. He was the “Account Manager for EMC,” and was EMC’s main contact person for “orders, deliveries, etc.”
Additionally, James Rose, another VSI employee, was principally responsible for various engineering issues relating to the integration of Vision’s products into EMC’s data storage systems. He was the only other Vision employee in regular contact with EMC.
The June 10, 2002, e-mail from Ouimette came from “Vision Systems, Inc., 35 Pond Park Road, Hingham, MA.”
And, most tellingly, all price quotations to EMC were provided by VSI; all sales to EMC were F.O.B Hingham, Massachusetts; and all orders from EMC were submitted to VSI at its Hingham office.[4], [5]
As a matter of law, the jurisdictional prerequisites to applicability of CISG are not met. Count II must be dismissed.
Count III
This count charges that EMC made “promises and representations” to Vision, upon which Vision relied to its detriment. “An essential element under the promissoiy estoppel theory is that there be an unambiguous promise and that the party to whom the promise is made reasonably relied on the representation.” Rhode Island Hospital Trust National Bank v. Varadian, 419 Mass. 841, 848 (1995). Attention is to be focused upon the reasonableness of the reliance by the promisee. Loranger Construction Corp. v. E.F. Hauserman Co., 6 Mass.App.Ct. 152, 159 (1978).
Where parties attempt to negotiate a detailed written agreement, as they did here for the better part of a year, it is unreasonable, as a matter of law, for one party to rely on alleged oral promises made by the other unless they were incorporated in an executed contract. Rhode Island Hosp. Trust supra, 419 Mass. at 850.
A commercial transaction of the kind which gives rise to this litigation often has many players ... The final governing documents are generally complex, reflecting adjustments to the requirements of the various participants. These papers are far from being just another “wheel in the machinery.” . . . Until the documents are signed and delivered the game is not over. Businessmen would be undesirably inhibited in their dealings if expressions of intent and exchange of drafts were taken as legally binding agreements.
Tull v. Mister Donut Dev. Corp., 7 Mass.App.Ct. 626, 631-32 (1979). See also Kuwaiti Danish, supra, 436 Mass. at 468.
The complaint itself recites the exchange of “countless drafts” of the agreement being negotiated for over a year. But no agreement was ever reached. Reliance on alleged parol promises by EMC in these circumstances was unreasonable as a matter of law.
Also, the terms of the supposed oral promises upon which Vision claims reliance are inconsistent with the terms of the drafts exchanged between the negotiating parties. There is nothing in those drafts suggesting a promise by EMC to purchase 6,900 SDUs from Vision. This does not support a promis-soiy estoppel claim, and, for that reason, Count III must be dismissed.
*144 Count IV
In this count Vision seeks relief because of an alleged breach of the covenant of good faith and fair dealing. Such a covenant is implied as part of every agreement in Massachusetts. But, in the absence of a contract, it cannot exist.
The implied covenant of good faith and fair dealing provides “that neither party shall do anything that will have the effect of destroying the right of the other party to receive the fruits of the contract...” (Emphasis added.) Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72 (1991). There must, therefore, be a contract bearing fruit for the complaining party’s picking. For the reasons stated above, there is no contract here. This count, therefore, must be dismissed as well.
Count V and Count VI
These two counts, in reverse order, seek relief for unjust enrichment or in the nature of quantum me-ruit. Quantum meruit, of course, is not a cause of action and should not really be a count.
Quantum meruit is a theory of recovery, not a cause of action. It is a claim independent of an assertion for damages under the contract, although both claims have as a common basis the contract itself. Recovery under this theory is derived from the principles of equity and fairness and is allowed where there is substantial performance but not full completion of the contract. See generally, 5 S. Williston, Contracts, sec. 805 (1961).
J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 793-94 (1986).
In any event, both the quantum meruit theory and the concept of unjust enrichment have similar bases.
“A person who has been unjustly enriched at the expense of another is required to make restitution to the other.”... The underlying basis for awarding quantum meruit damages ... is unjust enrichment of one party and unjust detriment... to the other party.
Salomon v. Terra, 394 Mass. 857, 859 (1985).
Vision must show that it provided something to EMC with the reasonable expectation of receiving compensation therefor; that EMC accepted that something with the expectation of paying Vision therefor; and that Vision conferred a measurable benefit on EMC. Bolen v. Paragon Plastics, Inc., 747 F.Sup. 103, 106-07 (D.Mass. 1990). None of that happened here.
Vision, at best, developed a product that it wanted to sell to EMC. In fact, Vision sold 1,247 production units of the Symm 6 SDUs, and EMC paid an aggregate sum of $872,900 therefor. These 1,247 production units were all that Vision had manufactured at the time EMC stopped purchasing. EMC on these facts did not receive anything from Vision that EMC did not pay for. There is no unjust benefit here. See, e.g., Community Builders, Inc. v. Indian Motorcycle Assoc., Inc., 44 Mass.App.Ct. 537, 560 (1998). There is therefore no unjust enrichment and no basis for awarding damages on a quantum meruit basis.
Counts V and VI cannot stand.
Count VII
This is the ubiquitous c. 93A count. To bring such a claim, there must be activity that constituted unfair or deceptive practices. “[A] practice or act will be unfair under G.L.c. 93A, sec. 2, if it is (1) within the penumbra of a common-law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.” Morrison v. Toys ‘R’ Us, Inc., Massachusetts, 441 Mass. 451, 457 (2004). See also Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 27 (1997); Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408 (1991). There is, however, no binding definition of what constitutes an unfair practice under c. 93A. The existence of unfair acts and practices must be determined from the circumstances of each case. Green v. Blue Cross & Blue Shield of Massachusetts, Inc., 47 Mass.App.Ct. 443, 447 (1999).
Without more, the failure to complete negotiations on a contract, followed by the purchase of some of the product and paying for it in full, is neither unfair nor deceptive, nor is it immoral, unethical, oppressive, or unscrupulous, particularly among sophisticated business people.
The Rule 56 motion record reveals the absence of a claim based on G.L.c. 93A. Count VII fails like the rest.
ORDER
For the foregoing reasons, the motion for summaiy judgment (Paper #13), by the defendant, EMC Corporation, is ALLOWED. Judgment shall enter dismissing the Amended Complaint, with prejudice, with each party to bear its own costs.

“NRE” is said by Vision to stand for non-reoccurring expenses or engineering, which it claims is synonymous with “research and development.”

Nliis sounds a lot like the “center of gravity of the circumstances” test that the SJC applies to determine whether a claim is primarily and substantially within the Commonwealth for purposes of G.L.c. 93A. See Kuwaiti. Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459, 473 (2003).

In its initial complaint in this case, VSI was the sole plaintiff. This alone permits an inference that VSI was the contracting party, if anyone was. See, e.g., Fellows, Gamage Co., Inc. v. Jackman, 296 Mass. 570, 573-74 (1937).

Even the drafts of the agreement so heavily negotiated, but never consummated, recite that the agreement “is made and entered into ... by and between EMC . . . and Vision Systems, Inc., having its principal office at 35 Pond Park Road, Hingham, MA (hereinafter referred to as VISION’).”