Fremont-Smith, Thayer, J.

INTRODUCTION

The Plaintiff, Gator Development, Inc., filed a seven-count complaint against the Defendant, New England Power Company, Inc., arising out of an attempted purchase of real estate. The Defendant now moves for summary judgment on all counts.

BACKGROUND

Viewed in the light most favorable to the nonmoving plaintiff, the materials submitted on the summary judgment motion establish the following facts.
Gater Development, Inc. (“Gator”) is in the business of real estate development. New England Power Company, Inc. (“NEP”) is the owner of property located off of Howard Street in Saugus, Massachusetts (“the Property”). In late 1998, Gator contacted representatives of NEP to discuss purchase of the Property, which Gator had identified as being “surplus.” Gator submitted multiple offers to purchase the Property to multiple employees of NEP. Initially on September 8, 1999, Gator offered $1,320,000.00 for the Property. This offer was transmitted to NEP employee Liana Moore, and was not accepted by NEP. On July 19, 2000, Gator submitted a revised offer with a two-tiered pricing proposal to a different NEP employee, Elizabeth Fresolone. This offer was not acted upon by NEP. On July 25, 2000 NEP wrote Gator, stating that “NEP does not intend to be bound by anything other than a fully executed agreement in form satisfactoiy to NEP.”
In the Fall of 2000, Gator began negotiating with another NEP employee, Steven Towle. According to Gator, after several rounds of negotiations, during which Towle conferred with his supervisors to refine the proposal and obtain management authorization, a verbal understanding was reached as to a two-tiered pricing structure. The price Gator was to pay NEP for the Property was dependant on its use: $1,320,0.00 if the Property was developed as a single-family subdivision, and $1,800,000 if developed as a multi-family development. However, this understanding was not memorialized in writing, despite repeated requests to NEP by Gator to do so. Several letters were exchanged between Gator and Towle, wherein Towle communicated that he needed approval and authorization from his supervisors in order to finalize a deal.
Notwithstanding, Gator continued to work on the development proposal, including a petition to the Town of Saugus to rezone the Property for multi-family use in order to realize the higher price for the Property. NEP knew of and authorized this petition.
On May 18, 2001, a draft Purchase and Sale Agreement (“P&S”) was sent to Gator with a letter which reiterated that “NEP does not intend to be bound by any other than a fully executed agreement.” Gator did not accept the draft agreement, but transmitted edits to NEP, which were never incorporated in a new draft. NEP then made repeated requests for NEP to “focus” on the P&S so that it might be completed, but a P&S was never finalized or signed.
In order to submit the permit application, Gator was required to show that it had “site control.” In July 2001, a Gator employee (J. Madden) communicated with NEP via e-mail, prior to Gator’s submission of its permit application, to confirm that the parties were “in the process of working toward the Purchase and Sale Agreement on the properly . . .” Satisfied by NEP’s response, Gator continued with the process.
Finally, by letter dated March 13, 2002, Gator reviewed the history of their negotiations and admitted it had been “denied a re-zone at Town Meeting (2001) and had not been able to generate any significant signs of approval.” It admitted that its “due diligence had left us at a crossroads,” and that “eight lots for single-family homes is the maximum we could hope for.” The letter added that “at $1.3 million, these numbers just don’t make for a suitable return ... we have done all that is possible to seek development . . . but the likelihood of the Town putting their arms around our concept is slight at best. The reality of National Grid to receive $1.8 million may only be possible through the issuance of a comprehensive permit.” Finally, the letter stressed Gator’s “commitment to the property” and its “intention to see it though to fruition.” The letter enclosed a new “suggested purchase and sale agreement” from Gator indicating a purchase price of $1,800,000 to be paid within 30 days after the issuance of an unappealable permit for low income housing from the Town. NEP rejected this proposal and counter-offered for a higher purchase price. This lawsuit ensued.

*620
DISCUSSION

Summary judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

Breach of Contract/Specific Performance

For an agreement for the purchase and sale of land to be enforceable, it must be in writing and signed by the parties. G.L.c. 259, §1; Schwarnbeck v. Federal-Mogul Corp., 412 Mass. 703, 709 (1992). A writing sufficient to satisfy the Statute of Frauds must contain all essential terms of the contract agreed upon. See Cousbelis v. Alexander, 315 Mass. 729, 730 (1944). In the purchase and sale of real estate, this includes the parties, the locus, the nature of the transaction, and the purchase price. See A.B.C. Auto Parts, Inc. v. Moran, 359 Mass. 327, 329 (1971). Multiple writings relating to the transaction may be read together in order to satisfy the writing requirement where they contain all material terms and are signed by the party to be charged. See Flynn v. Wallace, 359 Mass. 711, 717 (1971).
Whether a writing exists sufficient to satisfy the Statute of Frauds is a question of law for the Court. Simon v. Simon, 35 Mass.App.Ct. 705, 709 (1994). Where, as here, the defendant affirmatively pleads the Statute of Frauds as a defense, the burden is on the plaintiff to prove the existence of a writing complying with the requirements of the statute. Bogash v. Studios, Inc., 303 Mass. 207, 207-08 (1939).
Here, although there were many written communications between the parties, there were none which, even if read together, would permit a jury to find a “meeting of the minds” or an intention to be bound. The communications were in the nature of negotiations between sophisticated companies. Gator was repeatedly advised that a written purchase and sale agreement was required to effectuate the transaction, so was put on notice that “[u]ntil the documents are signed and delivered the game is not over.” Tull v. Mister Donut Development Co., 7 Mass.App.Ct. 626, 632 (1979). The plaintiffs repeated requests for a written P&S themselves evince plaintiffs understanding that this was the parties’ intention. As there were no writings exchanged between the parties sufficient to permit a jury to find a meeting of the minds or an intention to be bound, plaintiffs complaint for specific performance of an alleged contract must fail.

Breach of Oral Contract/Promissory Estoppel

“An essential element under the promissory estop-pel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation.” See Rhode Island Hospital Trust National Bank v. Varadian, 419 Mass. 841, 848 (1995). Where parties attempt to negotiate a detailed written agreement, it is unreasonable as a matter of law for one party to rely on an alleged oral promise made by the other unless it was incorporated in an executed contract. Id. at 850.
Here, not only was there no “unambiguous promise” but, in the circumstances here, a jury could not reasonably find there was reasonable reliance. As stated in Vision Systems, Inc. v. EMC Corp. (Ma.Super, Feb. 28, 2005, van Gestel, J.) [19 Mass. L. Rptr. 139):
Attention is to be focused upon the reasonableness of the reliance by the promisee. Loranger Construction Corp. v. E.F. Hauserman Co., 6 Mass.App.Ct. 152, 159 (1978).
Where parties attempt to negotiate a detailed written agreement, as they did here for the better part of a year, it is unreasonable, as a matter of law, for one party to rely on alleged oral promises made by the other unless they were incorporated in an executed contract. Rhode Island Hosp. Trust, supra, 419 Mass. at 850.

Unjust enrichment/Quantum Meruit

Where an alleged contract is unenforceable, damages in quantum meruit may be awarded under a theory of unjust enrichment. This provides an equitable remedy by requiring a person who has been unjustly enriched at the expense of another to make restitution to the other. Salamon v. Terra, 394 Mass. 857, 859 (1985). “Unjust enrichment is defined as ‘retention of money or property of another against the fundamental principles of justice or equity and good conscience.’ ” Santagate v. Tower, 64 Mass.App.Ct. 324, 329 (2005) (citations omitted). The fact that a person benefltted from another’s actions, however, is not in and of itself sufficient to show unjust enrichment so as to require the other to make restitution unless a defendant accepted the benefit knowing that the plaintiff expected to be paid for providing it. See Cox v. Cox, 56 Mass.App.Ct. 864, 873 (2002).
Here, Gator has failed to show that any quantifiable benefit was conferred on NEP by Gator with the reasonable expectation that Gator would be paid therefore. Indeed, Gator admits that it did not expect to be paid by NEP for Gator’s due diligence work conducted in furtherance of its development plan. The fact that NEP may have benefltted by learning that it was the owner of a property that could be of value to a devel *621 oper is not the type of unintended benefit which could constitute unjust enrichment.

Negligent Misrepresentation

Similar to its claim of promissory estoppel, any reliance by Gator on any oral assurances of NEP where a written agreement was repeatedly insisted upon, could not, in the circumstances here, be found to have been reasonable. See cases discussed supra in connection with promissory estoppel.

M.G.L.C. 93A

As the plaintiffs 93A claim is wholly derivative of its other claims discussed above, it must also fail as a matter of law. See, e.g. Pembroke Country Club, Inc. v. Regency Savs. Bank, F.S.B., 62 Mass.App.Ct. 34, 40-41 (2004).

ORDER

Accordingly, defendant New England Power Company, Inc.’s motion for summary judgment is ALLOWED, and final judgment shall be entered for the defendant.